TRUSTEES FOR ALASKA, ALASKA CENTER FOR THE ENVIRONMENT, Tamara Smid and Edwin Taylor, Appellants,

v.

Lennie B. GORSUCH, Commissioner, and Alaska Department of Natural Resources, Appellees.

No. S–4047.

Supreme Court of Alaska.

Aug. 21, 1992.

Michael M. Wenig, Anchorage, for appellants.

Ellen Toll, Asst. Atty. Gen., Anchorage, and Charles E. Cole, Atty. Gen., Juneau, for appellees.

Richard M. Johannsen, Perkins Coie, Anchorage, amicus curiae, of Diamond Shamrock–Chuitna Coal Joint Venture.

Before RABINOWITZ, C.J., and BURKE, MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

COMPTON, Justice.

This appeal challenges several aspects of a decision by the Commissioner of Natural Resources (commissioner) to issue a surface coal mining and reclamation operations permit under the Alaska Surface Coal Mining Control and Reclamation Act (ASCMCRA), AS 27.21.010–.999. We affirm the commissioner's decision in part, reverse in part and remand for further proceedings consistent with this opinion.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Any person who conducts a surface coal mining and reclamation operation in Alaska must obtain a permit issued under ASCMCRA. AS 27.21.060(a). In January 1985 Diamond Shamrock–Chuitna Coal Joint Venture (Diamond) applied for a permit to conduct surface coal mining on the western side of Cook Inlet. The Alaska Department of Natural Resources (DNR), Division of Mining (Division), approved Diamond's application on March 5 and August 21, 1987, after extensive review, public comment and revisions.

Trustees for Alaska, Alaska Center for the Environment, and several individuals who had participated in the comment and review process (collectively Trustees), appealed the decision to the commissioner under AS 27.21.150. After a hearing, the hearing officer issued a proposed decision rejecting Trustees' challenges relevant to this appeal. The commissioner adopted the hearing officer's proposed decision.

Trustees appealed the commissioner's decision to the superior court. AS 22.10.-020(d); Alaska Appellate Rule 602(a)(2). The superior court upheld the commissioner's decision, except to the extent that the permit coverage excluded an eleven mile access/haul road from the mine site to Cook Inlet. On rehearing, the superior

court concluded that the road could be permitted under a separate ASCMCRA permit. Trustees appeals the superior court's decision raising the following contentions:

1. DNR exceeded its discretion by "refusing to require that the following off-site facilities be covered under Diamond's permit: port stockpiling and loading facilities; coal conveyor to the port; gravel pits; employee housing; access/haul roads; and airstrip."

2. DNR violated ASCMCRA by approving a bond amount which "does not reflect the cost of all reclamation which will need to be performed during the life of the permit."

3. DNR violated ASCMCRA by issuing a permit when Diamond failed to prove "that its wetlands 'revegetation' plan will restore prior 'uses' of the land that were supported by wetlands and . . . will satisfy the applicable performance standards for hydrology, water quality, and wildlife habitat."

4. DNR's bond release criteria violate ASCMCRA because they "do not appear to make bond release contingent on Diamond's successful completion of its wetlands plan."

## II. APPLICABLE LAW

■ The parties disagree as to whether the federal Surface Mining Control and Reclamation Act of 1977 (SMCRA), 30 U.S.C. §§ 1201–1328 (1986), and the regulations promulgated thereunder, are controlling in this case.

SMCRA provides a process whereby a state may assume control of a program to regulate surface mining and reclamation operations. 30 U.S.C. § 1253 (1986). The state program must demonstrate, among other things:

that such State has the capability of carrying out the provisions of this chapter and meeting its purposes through—

(1) a State law which provides for the regulation of surface coal mining and

reclamation operations in accordance with the requirements of this chapter

(7) rules and regulations consistent with regulations issued by the Secretary pursuant to this chapter.

30 U.S.C. § 1253(a) (1986). Ultimately, the Secretary of Interior must approve the program. 30 U.S.C. § 1253(b) (1986). States which do not have approved programs are subject to federally implemented programs. 30 U.S.C. § 1254 (1986).

In 1982 the state of Alaska passed ASCMCRA as part of its effort to assume exclusive jurisdiction of surface coal mining and reclamation within the state. Ch. 29, § 1, SLA 1982; AS 27.21.010(a)(5). The legislature specifically expressed the state's intent "to assume exclusive jurisdiction over the regulation of surface coal mining and reclamation operations in the state under [SMCRA]." AS 27.21.010(a)(5). In enacting ASCMCRA, the legislature also found that:

Section 503 [30 U.S.C. § 1253] of [SMCRA] provides that a state wishing to assume exclusive jurisdiction over the regulation of surface coal mining and reclamation operations in the state must have a state law that provides for the regulation of surface coal mining and reclamation operations *in accordance with the requirements of* [SMCRA].

AS 27.21.010(a)(4) (emphasis added).

In light of this finding and the legislature's express intent to assume exclusive jurisdiction, we do not believe the legislature intended the state act to be inconsistent with the federal act. Moreover, section 505(a) of SMCRA provides that state laws or regulations which are inconsistent with its provisions are superseded by the SMCRA provisions. 30 U.S.C. § 1255(a) (1986). *Accord Russell v. Island Creek Coal Co.*, 182 W.Va. 506, 511, 389 S.E.2d 194, 199 (1989).

It is clear that both the Congress and the Alaska Legislature intended that the state program comply with SMCRA. Therefore, ASCMCRA should be construed to be consistent with SMCRA.[1]

---

**1.** However, while federal *regulations* promulgated under SMCRA may provide helpful guidance, they do not set a standard against which state law must be measured. In this context,

## III. FAILURE TO REQUIRE INCLUSION OF CERTAIN OFFSITE FACILITIES IN DIAMOND'S PERMIT.

■ Trustees argues that Diamond's permit should have covered the eleven mile access/haul road and adjacent conveyor from the mine site to a port, port facilities, a solid waste disposal facility, gravel pits, and a housing facility with an air strip and access road. Trustees asserts that these facilities fall within the broad statutory definition of "surface coal mining and reclamation operation" and therefore require an ASCMCRA permit. Trustees also argues that DNR's regulations implementing ASCMCRA plainly require a permit for these facilities. DNR argues that the determination of which facilities are "resulting from or incident to" the mine operation, which must be included in the permit, is within the special expertise of the commissioner and that the commissioner's decision was reasonable and based on policy considerations.

■ We defer to an agency decision which involves complex subject matter or fundamental policy considerations unless the decision is arbitrary, capricious or without a reasonable basis. *Trustees for Alaska v. State, Dep't of Natural Resources,* 795 P.2d 805, 809 (Alaska 1990). "The reasonable basis standard is appropriate for determining whether the agency decision has been undertaken 'in the manner required by law.' One indication whether an agency has proceeded in the manner required by law is compliance with its own regulations." *Jager v. State,* 537 P.2d 1100, 1107–08 (Alaska 1975).

■ Any person who conducts a "surface coal mining and reclamation operation" must first obtain an ASCMCRA permit. AS 27.21.060. "'[S]urface coal mining and reclamation operation' means a surface coal mining operation and the activities necessary and incidental to the reclamation of that operation after August 3, 1977...." AS 27.21.998(16).[2] The definition of "surface coal mining operations" in ASCMCRA is broad, and includes more than the actual mining activities. AS 27.-21.998(17) provides:

"[S]urface coal mining operations" means:

(A) an activity

(i) conducted on the surface of land in connection with a surface coal mine or, to the extent that the activity affects the surface of land, conducted in connection with an underground coal mine;

(ii) the products of which enter commerce or the operation of which directly or indirectly affects interstate commerce;

(iii) which may include contour, strip, auger, mountain top removal, boxcut, open pit, and area mining; the use of explosives and blasting; on-site distillation or retorting, leaching, or other chemical or physical processing of coal; and loading of coal for interstate commerce at or near the mine site;

(iv) other than an activity related to the extraction of coal incidental to the extraction of other minerals under which the coal extracted does not exceed 16⅔ percent of the total tonnage of coal and other minerals removed annually for purposes of commercial use or sale and other than a coal exploration activity subject to this chapter; and

(B) the areas on which an activity described in (A) of this paragraph occurs or where the activity disturbs the natural land surface, including adjacent land, the use of which is incidental to the activity; and affected by the construction of new roads or the improvement or use of existing roads to gain access to the site of the activity and for haulage; and excavation, workings, impoundments, dams, ventilation shafts, entry ways, refuse banks, dumps, stockpiles, overburden piles, spoil banks, culm banks, tailings, holes or depressions, repair areas, storage areas, processing areas, shipping areas, and

---

Alaska law is superseded only where it is inconsistent with the federal *statute.* 30 U.S.C. § 1255.

**2.** This is essentially identical to the federal definition of "surface coal mining and reclamation operations" found in SMCRA § 701, 30 U.S.C. § 1291(27) (1986).

other areas upon which are situated structures, facilities, or other property or materials on the surface resulting from or incidental to the activity....

AS 27.21.998(17).[3]

In this case, the Division refused to exercise ASCMCRA jurisdiction over the disputed facilities, citing several reasons.[4] The Division made no mention in its decision of state regulations relating to the range of facilities which require permitting under ASCMCRA. Instead, it relied on the state statutory language and federal case law. On review, the commissioner's hearing officer accepted the Division's decision as a "reasonable one" in light of the "good policy reasons which have been articulated by the Division for terminating its jurisdiction at [the secondary crusher]." However, in the same decision, the hearing officer noted that "11 [Alaska Administrative Code (AAC)] 90.155 provides that a permit is required for roads and support facilities outside of a mine's permit area."

We conclude that DNR's decision to refrain from exercising jurisdiction over the disputed facilities lacked a reasonable basis. Further, we conclude that the statutory definition of "surface coal mining operations" in AS 27.21.998(17) encompasses the facilities which are disputed in this case. Our conclusions are supported by the language of the statute and by regulations promulgated by DNR which clearly require permitting of many of the disputed facilities.

The state legislature defined "surface coal mining operations" to mean, inter alia, "other areas upon which are situated structures, facilities, or other property or materials on the surface *resulting from or incidental to* the activity." AS 27.21.-998(17)(B) (emphasis added). The disputed facilities, including the conveyor, airstrip, access roads, gravel pit, solid waste disposal facility, employee housing facilities, port and the coal storage facilities, would not be necessary in the absence of the coal mining operation. They will be built to support the mining activity, will be proximate to the mine and will be located in an otherwise generally undeveloped area. The disputed facilities can only be characterized as facilities which result from or are incidental to the mining operation. The seven reasons DNR gave for declining jurisdiction simply do not provide a reasonable basis for a different conclusion.

■ The lack of a reasonable basis for DNR's determination is highlighted by DNR's failure to comply with its own regulations. An agency is bound by the regulations it promulgates. *See* 2 Kenneth C. Davis, *Administrative Law Treatise* § 7:21 at 98 (2d Ed.1979). An agency has not acted in the manner required by law if its actions are not in compliance with its own regulations. *Jager*, 537 P.2d at 1107–08.

3. This definition closely parallels the federal definition of "surface coal mining operations" found in section 701 of SMCRA. 30 U.S.C. § 1291(28) (1986). The United States Court of Appeals for the District of Columbia Circuit has construed SMCRA as conferring considerable discretion on the regulatory authority in defining the scope of its own jurisdiction. *See National Wildlife Federation v. Lujan*, 928 F.2d 453, 461–63 (D.C.Cir.1991); *National Wildlife Federation v. Hodel*, 839 F.2d 694, 743–45 (D.C.Cir. 1988).

4. These reasons included:
(1) DNR has discretion in determining the extent of its jurisdiction with respect to offsite facilities which do not include coal processing;
(2) since coal processing is finished at the secondary crusher, the coal should be considered loaded for interstate commerce at that point and therefore DNR's jurisdiction under ASCMCRA ends;
(3) the hauling from the secondary crusher to the port will be operated by a separate entity;
(4) ASCMCRA "describe[s] how a mining operation should be conducted, but provide[s] little guidance to describe how facilities such as the port and employee housing should be operated."
(5) DNR does not have the expertise to regulate the construction of these offsite facilities;
(6) the facilities will require other permits which will address environmental concerns; and
(7) the location of the road, conveyor, and port have not yet been determined, therefore they could not have been included in the present permit.

In deciding that the disputed facilities were outside its jurisdiction, DNR apparently overlooked its own regulation which provides as follows:

> A permit is required for all roads, transportation, support facilities and utility installations included in 11 AAC 90.491, whether or not these facilities are outside the permit area of any particular mine. These facilities must comply with all performance standards of this chapter determined to be applicable by the commissioner and must comply with the appropriate bonding provisions of 11 AAC 90.201—11 AAC 90.207. In determining which requirements of this chapter are applicable, the commissioner will consider whether any given facility may be subject to the requirements of some other governmental permitting authority.

11 AAC 90.155.

The first sentence of this regulation is clear and unambiguous: a permit is required for all the offsite facilities listed in 11 AAC 90.491.

The facilities listed in 11 AAC 90.491 which must be designed, constructed, used and maintained in a manner which prevents or minimizes environmental damage include:

> *roads*, railroad loops, spurs, sidings, *surface conveyor systems*, chutes, aerial tramways, *airfields, ports, docks*, or other transportation facilities, mine buildings, *coal loading facilities at or near the minesite, coal storage facilities, storage facilities*, fan buildings, hoist buildings, preparation plants, sheds, shops, *and other support facilities....*

11 AAC 90.491(a) (emphasis added). Clearly many of the disputed facilities in this case are explicitly identified in this list. The facilities not explicitly identified are fairly encompassed by the phrase "other support facilities."

As defined by AS 27.21.998(17)(B), "surface coal mining and reclamation operation" encompasses all of the disputed facilities, including the conveyor, airstrip, access roads, gravel pit, solid waste disposal facility, employee housing facilities, port and the coal storage facilities. Therefore, these facilities must be permitted in accordance with ASCMCRA.

## IV. INCLUSION OF OFFSITE FACILITIES IN THE SAME ASCMCRA PERMIT AS THE MINE ITSELF.

■ Trustees argues that the superior court erred in its decision on rehearing in concluding that the access/haul road could be permitted under a separate ASCMCRA permit. Trustees asserts that the plain language and logic of ASCMCRA contemplate a single permit for an entire surface coal mining operation. It also asserts that allowing separate permits is inconsistent with the statute's remedial goals because it will allow DNR to ignore the cumulative or synergistic impacts of the combined activities.

DNR argues that neither ASCMCRA nor the regulations directly address whether a separate permit is required. It contends that 11 AAC 90.155 implies that a separate permit may be appropriate. DNR claims its interpretation of the regulation is reasonable and entitled to deference. DNR also asserts that cumulative impacts must be considered whether or not the offsite facilities are separately permitted.

■ "A permit is required for all roads, transportation, support facilities and utility installations included in 11 AAC 90.491, whether or not these facilities are outside the permit area of any particular mine." 11 AAC 90.155. The implication of this language is that support facilities may have separate permits from the individual mines they support. DNR's interpretation of its own regulations is neither plainly erroneous nor inconsistent with the regulations. Therefore it should be given effect unless it is contrary to ASCMCRA. AS 44.62.030.

The portions of ASCMCRA cited by Trustees do not on their face require that a single permit cover the entire mine operation and related facilities. Trustees urges that ASCMCRA precludes DNR's interpretation because it prohibits a person from conducting a "surface coal mining and reclamation operation in the state without a

permit for that operation." AS 27.21.060. We find nothing in this statutory language which requires us to interfere with DNR's interpretation that ASCMCRA allows separate permits to be issued for individual mines or for support facilities within a larger mining area.

■ However, statutory language does support Trustees' related argument that DNR may not ignore cumulative effects of mining and related support facilities by unreasonably restricting its jurisdiction and disregarding the effect of activities outside that jurisdiction.

One of ASCMCRA's purposes is "to prevent the adverse effects to society and the environment resulting from unregulated surface coal mining operations." AS 27.-21.010(b)(1). Other express purposes are "to assure that surface coal mining operations are conducted in a manner that will prevent unreasonable degradation of land and water resources," AS 27.21.010(b)(3), and "to strike a balance between protection of the environment and other uses of the land and the need for coal as an essential source of energy." AS 27.21.010(b)(7). These purposes cannot be accomplished by ignoring cumulative impacts.[5] Based on the policies inherent in these purposes, we conclude that DNR may not ignore cumula-

tive effects of mining and related support facilities by unreasonably restricting its jurisdiction or by permitting facilities separately. These purposes require that at the time DNR reviews any ASCMCRA permit application it consider the probable cumulative impact of all anticipated activities which will be a part of a "surface coal mining operation," whether or not the activities are part of the permit under review. If DNR determines that the cumulative impact is problematic, the problems must be resolved before the initial permit is approved.[6]

After reviewing the record, we are unable to conclude that in approving Diamond's permit application, DNR substantially complied with its obligation to consider the cumulative environmental effects of the entire mining operation. DNR had the benefit of the United States Environmental Protection Agency's (EPA) analysis of the cumulative impacts of the mine operation, including the effects of facilities which must be permitted but were excluded by DNR from the Diamond permit at issue.[7] However, DNR has not directed this court to portions of its decision in which it meaningfully considered the effects of the facilities it erroneously determined were not within its jurisdiction.[8] Because of this

---

**5.** DNR is specifically required to consider cumulative hydrologic impacts. AS 27.21.-180(c)(3).

**6.** This type of "concept approval" is necessary in order to avoid a situation where, because of industry investment and reliance upon a past mining permit approval, DNR might feel compelled to approve a subsequent permit for a related but environmentally unsound support facility. In some cases, this may require concurrent, as opposed to serial, review of separate, related permit applications. In other cases, anticipated problems resulting from cumulative impacts may require that approval of an initial permit be conditioned upon satisfactory resolution of the problems anticipated in subsequent permits.

**7.** The EPA specifically considered the effects of these offsite facilities on wildlife, groundwater hydrology, surface water hydrology, and biology. Further, the EPA considered the cumulative impacts resulting from the development of other coal or natural resource projects in addition to the Diamond project.

**8.** In an appendix to its March 1987 findings, DNR made a "cumulative hydrologic impact assessment." However, it is not clear that the conveyor system or the port were considered in this assessment. Further, it appears that DNR was aware of but consciously chose not to consider the cumulative effects of the port and conveyor on moose in the area. DNR found as follows:

Through the development of all facilities associated with the mine operation (port, conveyor system, and mine site) a portion of the winter range will be disrupted, movement corridors may be changed due to the conveyor, and a section of one rutting area will be lost. The overall effect of these habitat disruptions may be quite different from the impacts associated with only the loss of part of a rutting area.... Although it is necessary to be aware of the potential for these types of cumulative impacts to occur, the authority to require monitoring and mitigation under the Surface Mining Program extends only to impacts directly resulting from operations under this permit.

lapse, this case must be remanded to DNR for consideration of the cumulative environmental effects of the entire "surface coal mining operation" including the conveyor, airstrip, access roads, gravel pit, solid waste disposal facility, employee housing facilities, port and the coal storage facilities.

## V. APPROVAL OF BOND AMOUNTS INADEQUATE TO COVER THE TOTAL COST OF RECLAMATION.

Trustees argues that DNR erred in calculating the bond amounts by assuming that Diamond will have complied with all the reclamation requirements on schedule up until the time of any default. Trustees contends that this assumption violates the plain meaning and spirit of the bonding requirements of AS 27.21.160 and DNR's regulations on bonding amounts. Trustees asserts that there is no reasonable basis for assuming that all ongoing reclamation requirements will be fully complied with up until forfeiture. Trustees also argues that it is unreasonable to assume that DNR's enforcement power will promptly remedy violations.

DNR asserts that bond amounts are left to the discretion of the commissioner and that they cover the full cost of reclamation which may be required if the operation were to shut down at any given point. DNR points out that Diamond must submit annual status reports and that DNR can require additional bonding.

■ Trustees argues that the issue of the adequacy of the bond required is a legal one. In its view, the substitution of judgment standard applies. DNR urges review on the reasonable basis standard because bond calculations require administrative expertise.

Alaska Statute 27.21.160(a) provides:

The amount of the bond required for an area within the permit area shall be determined by the commissioner and shall reflect the probable difficulty of the reclamation considering the topography, geology, hydrology, revegetation potential, and similar factors relating to the area. The amount of the bond must be suffi-

cient to assure the completion of the reclamation plan by the commissioner in the event of forfeiture...

AS 27.21.160(a).

Under the statute, the bond calculation involves technical analysis and the exercise of agency expertise and is clearly left to the discretion of the commissioner. We apply a "rational basis" review where an issue "requires resolution of policy questions which lie within the agency's area of expertise and are inseparable from the facts underlying the agency's decision." *Earth Resources Co. of Alaska v. State, Dep't of Revenue,* 665 P.2d 960, 964 (Alaska 1983).

However, Trustees does not challenge DNR's technical analysis or the factual sufficiency of the bond calculations. Rather, it asserts that DNR's assumption that a permittee will have no permit violations at the time of default is unreasonable and contrary to the statute.

This challenge does not implicate agency expertise. "[W]here the knowledge and experience of the agency is of little guidance to the court or where the case concerns 'statutory interpretation or other analysis of legal relationships about which the courts have specialized knowledge and experience,'" we may substitute our own judgment for that of the agency's. *Id.* at 965, *quoting Kelly v. Zamarello,* 486 P.2d 906, 916 (Alaska 1971).

■ In its decision, the Division rejected Trustees' criticism of its assumption that the regrading and reclamation schedules in the application will be followed:

To do as the commenter suggests, which is to determine the bond amount as though no reclamation at all has taken place during the permit term, is unreasonable and would result in the state holding a considerable [sic] larger bond than would ever be necessary to reclaim the site. If, as suggested ... the applicant were to disregard regrading and revegetation schedules in the application, this would constitute a violation of the permit. [DNR] is required to inspect the site on a monthly basis, and has the

power to enforce the permit provisions should a violation occur. *Basing the bond amount on the assumption that the applicant will violate permit terms is unfair and unnecessary.* (Emphasis added). DNR adopted the Division's reasoning.

We believe the Division's reasoning and its assumption are fundamentally flawed. We conclude that ASCMCRA *requires* DNR to "base[ ] the bond amount on the assumption that the applicant will violate permit terms."

The purpose of the bond is to insure "faithful performance of the requirements" of ASCMCRA and "to assure the completion of the reclamation plan ... in the event of forfeiture." AS 27.21.160(a). A performance bond is drawn upon only where there has been a failure of performance. The bond would be unnecessary absent the assumption that a permittee may not fully perform its obligations. The amount of the bond is academic absent a failure.

In light of these elementary facts, we believe it unreasonable and indeed illogical to conclude that DNR's enforcement efforts will assure a permittee's full compliance with reclamation obligations until a forfeiture. DNR's enforcement powers cannot prevent permit violations. If they could, performance bonds would not be necessary.

The Division intimated that if reclamation does not progress as scheduled, adjustments could be made in the bond amount. But if the operation folds at the point where DNR discovers reclamation violations, a bond calculated under the assumption of compliance up to that point will necessarily be inadequate. The bonds required by DNR will only be adequate to assure full reclamation in the event that forfeiture occurs at a point when no violations exist. We conclude that the Division's assumption that no violations will exist at the time of forfeiture is unreasonable.[9]

DNR should recalculate the bonds so that they are "sufficient to assure the completion of the reclamation plan by [DNR] in the event of forfeiture." AS 27.21.160(a). This does not necessarily mean that DNR must require Diamond to post a bond equal to the total reclamation cost. DNR should calculate the bond assuming forfeiture at a time when unabated permit violations exist, though it need not assume that *no* reclamation will have taken place.

## VI. APPROVAL OF DIAMOND'S WETLANDS RESTORATION PLAN.

### A. *Restoration of Ecological Functions and Revegetation.*

■ Trustees argues that ASCMCRA and SMCRA require restoration of ecological functions provided by wetlands and that the revegetation plan approved by DNR does not satisfy those requirements. Trustees asserts that: (1) the plan is too vague; (2) restoration sites will not be chosen to maximize their effectiveness, but rather they will be based on the regrading; (3) the plan does not discuss how it will replace ecological functions or why that may be infeasible or unnecessary; (4) DNR could not have reasonably determined that the plan was adequate from a hydrologic standpoint because DNR did not have a hydrologist review it; (5) DNR did not consider the adequacy of the plan from a water quality standpoint; and (6) DNR did not consider whether the plan is sufficient from the standpoint of wildlife habitat.

ASCMCRA directs the commissioner to propose regulations consistent with the environmental performance standards of SMCRA and directs that all permits issued require compliance with those environmental performance standards. AS 27.21.210. Trustees has not pointed to any evidence that Diamond's application violates the performance standards, but claim that DNR approved Diamond's application without

---

**9.** One of the grounds for forfeiture of a bond is a willful or unwarranted pattern of violations.

11 AAC 90.617(a).

sufficient evidence that it will restore wetlands functions.[10]

The pre-mining and post-mining use of the area to be disturbed is fish and wildlife habitat. The Division accepted the wetlands plan despite concerns that some of the peat-filled depressions Diamond proposed to create might be too small to function effectively. The Division did not require modification because the restoration plan was a trial program and it would be reevaluated at the permit midterm review. DNR found that the reclamation plan with the wetlands restoration plan was sufficient to restore the disturbed area to a condition capable of supporting fish and wildlife.

DNR's assessment of the adequacy of the wetlands restoration plan is necessarily speculative and it involves complex subject matter which is within the expertise of the agency. Therefore, we will defer to DNR's decision unless it is arbitrary, capricious, or without a reasonable basis. *Trustees for Alaska,* 795 P.2d at 809.

In our view, DNR's acceptance of the plan meets the reasonable basis standard. The plan describes how wildlife habitat will be recreated by constructing peat-filled depressions which will be replanted with various plant species. In addition, three sediment ponds will be inoculated with plant and insect life forms, and seedlings will be planted to provide a vegetation canopy layer for the benefit of wildlife. In light of the complexity of the subject matter, we will defer to DNR's conclusion that these measures will be adequate to restore wildlife habitat.[11]

B. *DNR's Bond Release Criteria.*

■ Trustees asserts that DNR must require Diamond to successfully reestablish wetlands as a criterion for bond release. Trustees argues that "completion of the reclamation plan" includes wetlands restoration.

In its decision, the Division made the following comments in response to Trustees' concern that DNR would not evaluate the success of the wetlands restoration before releasing the bond:

[DNR] intends to evaluate any bond release application in terms of the revegetation success criteria of plant cover, species diversity and woody plant density (11 AAC 90.451—11 AAC 90.457). Largely because the wetlands areas are small, separate sampling of the restored wetlands has not been required. Rather, these would be considered as an inclusion within the surrounding vegetation type. Furthermore, there is no specific authority in [ASCMCRA] to support establishing additional bond release criteria to determine whether wetlands have been reestablished successfully (i.e., retention of water, utilization by wildlife, growth of *Sphagnum,* etc.). For this reason, and because of the trial nature of the program, no such demonstration has been required.

In our view, no reasonable basis exists for the Division's conclusions. Under ASCMCRA, bond release is "conditioned on faithful performance of the requirements of this chapter and the permit.... The amount of the bond must be sufficient to assure the *completion of the reclamation plan* by the commissioner in the event of forfeiture...." AS 27.21.160(a). This makes it clear that a performance bond must be conditioned on completion of the reclamation plan contained in the permit, irrespective of other specific bond release criteria. The record demonstrates that wetlands restoration is part of the reclamation plan. The commissioner may not release all or part of a bond if part of the permit area covered by the bond is in violation of the performance standards established by regulation. AS 27.21.170(d).

AFFIRMED in part, REVERSED in part and REMANDED. The superior court is directed to remand the permit application to DNR for consideration of the cumulative

---

10. The Division required by stipulation that Diamond submit a wetlands plan within six months of permit approval. The Division removed the stipulation when Diamond submitted the plan.

11. We are not persuaded by Trustees' other objections to the restoration plan.

effects of all activities which are part of the "surface coal mining operation," for reconsideration of the amount of the bond and for further proceedings in accordance with this opinion.

RABINOWITZ, Chief Justice, with whom MATTHEWS, Justice, joins dissenting in part.

I disagree with part IV of the court's opinion, holding that DNR's interpretation of its regulations as allowing separate ASCMCRA permits for different components of a surface coal mining operation is neither "plainly erroneous nor inconsistent with the regulations" or with ASCMCRA.

Alaska Statute 27.21.060 provides in part: "a person may not conduct a surface coal mining and reclamation operation in the state *without a permit* for that operation." (Emphasis added.) *See also* SMCRA § 506(a), 30 U.S.C.A. § 1256(a); 11 AAC 90.002(c). The language of AS 27.21.-060 contemplates that a single permit will control all components of a "surface coal mining operation."

The applicable definition of a "surface coal mining operation" includes the actual mine site and all facilities and structures, either off-site or on-site, that are "resulting from or incidental to" the mining. AS 27.-21.998(17). Subsection (A) defines "surface coal mining operation" in terms of "an activity" conducted at the actual mine site. AS 27.21.998(17)(A). The definition of a surface coal mining operation is further broadened in subsection (B):

> (B) the areas on which an activity described in (A) of this paragraph occurs or where the activity disturbs the natural land surface, including adjacent land, the use of which is incidental to the activity; and affected by the construction of new roads or the improvement or use of existing roads to gain access to the site of the activity and for haulage; and excavation, workings, impoundments, dams, ventilation shafts, entry ways, refuse banks, dumps, stockpiles, overburden piles, spoil banks, culm banks, tailings, holes or depressions, repair areas, storage areas, processing areas, shipping areas, and

other areas upon which are situated structures, facilities, or other property or materials on the surface resulting from or incidental to the activity[.]

AS 27.21.998(17).

While DNR's assertion that "11 AAC 90.155 ... infers that a separate permit is appropriate" for the access/haul road is a plausible interpretation of that regulation, I disagree with the court's conclusion that DNR's interpretation is not "inconsistent with the regulations." (Majority Op. 12) In my view, DNR's separate permit interpretation is in direct contravention with the text of another DNR regulation, 11 AAC 90.002, which is substantially similar to AS 27.21.060(a). 11 AAC 90.002(a) provides in part "no person may conduct exploration activities or surface coal mining and reclamation operations without *a permit*." (Emphasis added.)

The DNR regulations and DNR's interpretation of those regulations and ASCMCRA, allowing the issuance of separate permits for the access/haul road and the remainder of the mining operation, are contrary to the express purposes of ASCMCRA. Among the enumerated purposes of the statute are "to prevent the adverse effects to society and the environment resulting from unregulated surface coal mining operations" and "to assure that surface coal mining operations are conducted in a manner that will prevent unreasonable degradation of land and water resources." AS 27.21.010(b)(1) and (3). The court reasons that to accomplish the purposes of the Act,

> at the time DNR reviews any ASCMCRA permit application it [must] consider the probable cumulative impact of all anticipated activities which will be a part of a 'surface coal mining operation,' whether or not the activities are part of the permit under review.

(Majority Op. 1246) I do not believe that the court's mandated "concept approval," in the context of an operation whose anticipated components will be covered by separate permits, is an adequate substitute for the safeguards of the single permit requirement of AS 27.21.060 in light of the goal of assuring that the agency consider

the cumulative or synergistic effects of a coal mining operation. In contrast to the anticipated "concept approval" approach adopted by the court, I believe that the requirement, found in AS 27.21.060, of a single permit will compel the permit applicant to plan and design the operation and its various components in more concrete and greater detail. This should lead to consideration by the permit applicant and DNR of the operation's cumulative effect in a more careful and comprehensive manner.

Courts have disallowed segmentation of a proposed project for the purpose of preparing environmental impact statements (EISs) to assure that the cumulative effects of the project are adequately considered under the National Environmental Policy Act (NEPA). *Thomas v. Peterson,* 753 F.2d 754 (9th Cir.1985); *see also Kleppe v. Sierra Club,* 427 U.S. 390, 410–411, 96 S.Ct. 2718, 2730–2731, 49 L.Ed.2d 576 (1976); *Save the Yaak Committee v. Block,* 840 F.2d 714 (9th Cir.1988). In discussing a Forest Service plan to prepare an EIS for the logging access road and a separate EIS for each individual timber sale area afterward, *Thomas* cautioned that allowing consideration of cumulative impacts after a portion of the project is already approved "swings the balance decidedly in favor of timber sales even if such sales would have been disfavored had road and sales been considered together before the road was built." 753 F.2d at 760. While I recognize that in some instances phased implementation of a mining operation may require a reopening and modification of the ASCMCRA permit, the same danger that *Thomas* counselled against inheres in the instant case. Thus, I conclude that AS 27.21.060 assures that the cumulative and synergistic effects are adequately addressed by its requirement of a single ASCMCRA permit for all components of a surface coal mining operation.