**COOK INLET KEEPER, Appellant,**

v.

**STATE of Alaska, Office of Management and Budget, Division of Governmental Coordination, Appellee,**

**Forest Oil Corporation, Intervenor–Appellee.**

**No. S–9730.**

Supreme Court of Alaska.

May 3, 2002.

Michael J. Frank and Rebecca L. Bernard, Trustees for Alaska, Anchorage, for Appellant.

Lisa A. Weissler and Kirsten Swanson, Assistant Attorneys General, and Bruce M. Botelho, Attorney General, Juneau, for Appellee State of Alaska.

Kyle W. Parker and David J. Mayberry, Patton Boggs, LLP, Anchorage, for Intervenor–Appellee Forest Oil Corporation.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

### OPINION

BRYNER, Justice.

## I. INTRODUCTION

Alaska law requires all projects affecting coastal areas to be reviewed for consistency

with the Alaska Coastal Management Program. The state issued a final consistency determination approving the installation and operation of a new offshore exploratory drilling platform in the Cook Inlet over the Redoubt Shoals. In finding the project consistent with the Coastal Program, the state excluded from its .consistency review the platform's proposed discharges of various wastes—discharges that were already authorized under a general federal permit covering exploratory drilling discharges throughout the upper Cook Inlet area. Because the state had a statutory duty to conduct a project-specific consistency review encompassing all activities for which the Osprey project needed a permit, including a general permit that already existed, we reverse and remand for a new consistency determination.

## II. FACTS AND PROCEEDINGS

The Alaska Coastal Management Act[1] requires the state to establish and enforce the Alaska Coastal Management Program (Coastal Program), which protects Alaska's coastal areas by ensuring that commercial and industrial development is consistent with Alaska's environmental and cultural interests.[2] Under the Act, state agencies can authorize activities involved in a project having significant impacts in Alaska's coastal areas only if the state determines that the project is consistent with the applicable Coastal Program standards.[3] The Alaska Governor's Office of Management and Budget is responsible for determining whether projects requiring approval from two or more state resource agencies are consistent with the Coastal Program;[4] within that office, the responsibility is assigned to the Division of Governmental Coordination.[5] The Alaska Coastal Policy Council promulgates the

Coastal Program's regulations and hears petitions for review of consistency determinations.[6]

In May 1998 Forcenergy Inc.—now Forest Oil Corporation—filed with the state a project questionnaire, permit applications, and supporting information seeking to install an exploration platform over the Redoubt Shoals in Cook Inlet to conduct exploratory drilling for oil and gas; the platform would later be converted to a production operation if Forest Oil discovered sufficient oil and gas reserves. Forest Oil named the proposed platform "the Osprey," described it as a new project, and stated that the company did not "currently have any State, federal, or local permits related to the activity." Forest Oil noted that the platform would discharge wastewater from industrial or commercial operations, that it would use a disposal system, that the wastewater discharge would exceed 500 gallons per day, and that the company expected to request a mixing zone permit—a permit option when discharges exceed Alaska water quality standards.[7] It also listed as pending a United States Environmental Protection Agency (EPA) discharge permit.

The state initiated a ninety-day Coastal Program consistency review for the Osprey project by letter dated August 26, 1998. The state's letter initiating the review listed seven permits within the scope of the Osprey project's consistency review process, including an individual federal wastewater discharge permit. The letter also stated that the EPA was in the process of finalizing a general wastewater permit that was expected to cover all discharges into the Cook Inlet by various exploratory drilling operations and that Forest Oil's individual wastewater permit application would be withdrawn in favor

---

1. AS 46.40.010–.210 (2000).

2. *Hammond v. North Slope Borough*, 645 P.2d 750, 761 (Alaska 1982).

3. *See* AS 46.40.094; AS 46.40.096; AS 46.40.210(3), (7); 6 AAC 80.010(b) (2000); *see also Hammond*, 645 P.2d at 761.

4. AS 44.19.145(a)(11); *see also* AS 46.40.094; AS 46.40.096; 6 AAC 50.030; *Trustees for Alaska*

*v. State, Dep't of Natural Res.*, 795 P.2d 805, 811 (Alaska 1990).

5. 6 AAC 50.010(1); 6 AAC 50.030(a). For simplicity's sake, this opinion will refer to the Division of Governmental Coordination as the state.

6. AS 46.40.040; AS 46.40.096; 6 AAC 50.370.

7. AS 46.03.100 (requiring a permit); 18 AAC 70.015 (listing permit options); 18 AAC 70.240 (providing mixing zones permit).

of the general permit if the general permit was issued first.

Cook Inlet Keeper, which describes itself as "a member-supported nonprofit organization dedicated to protecting habitat and water quality in the Cook Inlet watershed," submitted comments during the public comment period of the Osprey project's consistency review process. The public comment period ultimately ended on July 30, 1999. By then, the EPA had finalized and issued its general permit authorizing specified wastewater discharges for existing and future exploratory drilling projects throughout state waters within the upper Cook Inlet. The general permit had undergone its own consistency review process, which culminated in the state's issuance of a final consistency determination finding the general permit to be consistent with the Coastal Program.

In its comments on the Osprey project's consistency review, Cook Inlet Keeper acknowledged that the EPA's general wastewater permit covered the Osprey's proposed operations. But Cook Inlet Keeper asserted that state law—specifically, the standards adopted under the Alaska Coastal Management Act—nonetheless provided greater environmental protection. Cook Inlet Keeper urged the state to prohibit the Osprey from discharging toxic wastes created during exploration because discharging the wastes would not "maintain or enhance" habitat and so would violate the Coastal Program's habitat standard.[8] Cook Inlet Keeper further asserted that the Osprey platform would be installed in an area of significant fresh water inputs and so should be held to the habitat standard's specific criterion for estuaries, which broadly requires avoidance of toxic waste discharges.[9] Alternatively, Cook Inlet Keeper argued, the offshore criterion of the habitat standard would prohibit the Osprey from discharging toxic wastes because fisheries would not be maintained or enhanced.[10] Cook Inlet Keeper also expressed concerns about the Osprey's potential interference with whale migration and feeding areas.

On September 2, 1999, about a month after the public comment period closed, the state issued its proposed consistency determination for the Osprey project. The state found the Osprey project to be consistent with the Coastal Program, provided that certain conditions were met. But the state specifically noted that it had excluded the Osprey's wastewater discharge activities from the project's consistency review because the EPA's recently issued exploratory discharge general permit already covered those activities:

> Discharge of water-based drill cuttings and muds, wastewater discharges, including gray water, treated sewage and treated effluent from the rig oil/water separator will be regulated by the U.S. Environmental Protection agency (EPA) Cook Inlet National Pollutant Discharge Elimination System (NPDES) General Permit. This general permit has been previously reviewed for consistency with the [Coastal Program], so activities associated with the general permit are not part of [the Osprey] consistency review.

In September 1999 the state issued a final consistency determination for the Osprey project that essentially conformed to its earlier proposed consistency finding. Cook Inlet Keeper appealed to the superior court; Forest Oil intervened as an appellee. The superior court affirmed the consistency determination, concluding that the state properly excluded the Osprey's exploration-related discharges from the project's consistency review process because those activities had already been considered and found to be consistent with the Coastal Program in the state's consistency review that occurred during the EPA's general permit process.

Cook Inlet Keeper appeals, arguing that the state impermissibly omitted the Osprey's wastewater discharge activities from the project's consistency review.[11]

---

8. See 6 AAC 80.130(b).

9. See 6 AAC 80.130(c)(2).

10. See 6 AAC 80.130(c)(1).

11. Cook Inlet Keeper separately contends that the final consistency determination fails to address the violation of the habitat standard that would inevitably result from towing the Osprey platform from its construction site at Port Graham to its installation point on the Redoubt

## III. DISCUSSION

### A. Standard of Review

When we consider an administrative appeal from a decision rendered by the superior court acting as an intermediate appellate tribunal, we review the administrative agency's determination directly.[12] Because our decision in this appeal turns on issues of statutory interpretation and related legal questions concerning waiver and estoppel, we apply our independent judgment.[13]

### B. Exclusion of Federally Permitted Toxic Discharges from the Osprey Project's Consistency Review

#### 1. Statutory and regulatory framework

In *Hammond v. North Slope Borough*,[14] we described the relevant effects of the Alaska Coastal Management Act as follows:

The Alaska Coastal Management Act, AS 46.40.010–.210, provides for the establishment of an Alaska Coastal Management Program (ACMP), which is partly designed to ensure that the development of industrial and commercial enterprises is consistent with the environmental and cultural interests of the state. AS 46.40.020. The Act provides that the ACMP is to consist of standards issued by a Coastal Policy Council and district management programs established by coastal resource districts. AS 46.40.030. The current ACMP establishes an Office of Coastal Management which must, among other things, "review state and federal actions for consistency with the Alaska coastal management program, subject to council review." 6 AAC 80.030(a)(3). The regulations also provide that a state agency may authorize uses or activities in the coastal area under its statutory authority only if "the agency finds that the use or activity is consistent with the applicable district program and the standards contained in this chapter." 6 AAC 80.010(b)....

....

The ACMP consists of two elements: the local district programs and the state standards found in 6 AAC 80.040.120. The state standards are extremely protective of the environment. For example, in areas in which there is a "substantial possibility that geophysical hazards may occur," state agencies must ensure that measures have been taken to minimize property damage and protect against loss of life before development of the area may begin. 6 AAC 80.050. State agencies must also "recognize and assure opportunities for subsistence usage of coastal areas and resources." 6 AAC 80.120.... With regard to the habitats in coastal areas, they "must be managed so as to maintain or enhance the biological, physical, and chemical characteristics of the habitat which contribute to its capacity to support living resources." 6 AAC 80.130(b).... Agencies must also "discourage activities which would decrease the use of barrier islands by coastal species, including polar bears and nesting birds." 6 AAC 80.130(c)(5).

These requirements, however, are not absolute. Conflicting uses and activities may be allowed by the district or appropriate state agency if:

(1) there is a significant public need for the proposed use or activity;

(2) there is no feasible prudent alternative to meet the public need for the proposed use or activity ...;

(3) all feasible and prudent steps to maximize conformance with the standards ... will be taken.

6 AAC 80.130(d)....

---

Shoals. But the platform's towing and installation have now been completed, and since Cook Inlet Keeper has failed to show that this issue is likely to recur and evade future review, the issue appears to be functionally moot. *Cf. Smith v. Cleary*, 24 P.3d 1245, 1251–52 (Alaska 2001).

12. *N. Alaska Envtl. Ctr. v. State, Dep't of Natural Res.*, 2 P.3d 629, 633 (Alaska 2000).

13. *Id.* (statutory interpretation); *State, Dep't of Commerce & Econ. Dev., Div. of Ins. v. Schnell*, 8 P.3d 351, 359 (Alaska 2000) (res judicata); *Wall v. Stinson*, 983 P.2d 736, 739 (Alaska 1999) (collateral estoppel); *Trustees for Alaska v. State, Dep't of Natural Res.*, 865 P.2d 745, 747–48 (Alaska 1993) (waiver).

14. 645 P.2d 750 (Alaska 1982).

Thus, there are two alternative methods a state agency may use. Either the agency must find that all the specific environmental protections have been met or, if there will be conflicting uses, the agency must find that the three pronged test delineated above has been satisfied.[15]

### 2. Analysis

■ Cook Inlet Keeper asserts that the state violated this process by completely excluding the Osprey's wastewater discharge activities from the project's consistency review process. It maintains that when a project like the Osprey platform undergoes a consistency review, the state must evaluate all licensed or permitted activities involved in the entire project, regardless of whether individual permits have already been issued.

According to Cook Inlet Keeper, the entire Osprey exploratory platform is a single project encompassing all the activities associated with the Osprey. In particular, Cook Inlet Keeper contends, the Osprey's wastewater discharges are part of the Osprey project because they are reasonably foreseeable impacts of the platform's construction and operation.

The state and Forest Oil respond that the EPA's general permit authorizing exploratory drilling discharges covers all oil and gas exploration in the Cook Inlet—including the Osprey's exploration activities. Because the general permit underwent its own consistency review process and was found to be consistent with the Coastal Program, they reason, the consistency review process for the Osprey project had no need to consider these already-permitted activities.

But Cook Inlet Keeper answers that even though the state determined the EPA's general permit to be consistent with the Coastal Program, the state has not conducted a specific consistency review of the Osprey's discharge activities in the particularized context of the Osprey project; this project-specific

evaluation, Cook Inlet Keeper insists, is mandated by law and necessary as a practical matter to enable the state to accurately assess the environmental consequences of the Osprey project as a whole.

Cook Inlet Keeper's arguments have merit. In contending that the issuance of a general permit for a given activity exempts that activity from project-specific review in future projects, the state mistakenly conflates two separate processes. As the Alaska Coastal Management Act's implementing regulations make clear, the Act's consistency review requirements apply independently of, and in addition to, any requirements that attach to the issuance of a permit authorizing a discrete activity:

> In authorizing uses or activities in the coastal area under its statutory authority, each state agency shall grant authorization if, *in addition to* finding that the use or activity complies with the agency's statutes and regulations, the agency finds that the use or activity is consistent with the applicable district program and the standards contained in this chapter.[16]

By distinguishing consistency review from compliance with agency permitting requirements, this regulation strongly suggests that an activity generally found to meet permitting requirements cannot, by mere virtue of already having been generally permitted, evade inclusion in a subsequent consistency review process that is statutorily mandated for a specific new project in which that activity will occur.

Added support for this proposition is found in statutory provisions requiring project-specific consistency review. Under AS 44.19.145(a)(11), the Governor's Office of Management and Budget must conduct a consistency review and make a consistency determination "when *a project* requires a permit, lease, or authorization from two or more state resource agencies."[17] A consis-

---

15. *Id.* at 761–62 (internal emphasis omitted).

16. 6 AAC 80.010(b) (emphasis added).

17. AS 44.19.145(a)(11) (emphasis added). The full text of paragraph .145(a)(11) is as follows:

(a) The [Office of Management and Budget] shall

. . . .

(11) render, on behalf of the state, all federal consistency determinations and certifications authorized by 16 U.S.C. 1456 (Sec. 307, Coast-

tency review also must be performed when a project requires a permit, lease, or authorization from only a single agency; but in such cases the issuing agency is responsible for coordinating the project's consistency review: "If a consistency review is not subject to AS 44.19.145(a)(11) because *the project* for which a consistency review is made requires a permit, lease, or authorization from only one state agency, that state agency shall coordinate the consistency review of *the project.*" [18]

■ Read together, these statutory provisions unequivocally establish that consistency review must be a *project*-specific process. And this point becomes even clearer when these provisions are read in conjunction with the above-quoted regulation requiring the state to determine consistency *"in addition to* finding that the use or activity complies with the agency's statutes and regulations" that govern issuance of permits.[19]

The statutory definition of "consistency review" further reinforces the project-specific nature of the consistency review process; and this definition also clarifies that each consistency review determination must encompass the entire project: " '[C]onsistency review' means the evaluation of a proposed

project against the standards adopted by the council under AS 46.40.040 and a district coastal management program approved by the council under AS 46.40.060." [20] Regulations governing the Division of Governmental Coordination cement the latter point—that a consistency determination must encompass the entire project it covers—by broadly defining "project" to encompass any

> activity or use that will be located in or may affect the coastal zone of this state and that is subject to consistency review under 16 U.S.C. 1456(c), or that requires the issuance of at least one state permit; "project" includes each phase of a project when a land or water activity is developed or authorized in discrete phases, and each phase requires a state decision regarding permits[.] [21]

And as Cook Inlet Keeper further correctly points out, additional, albeit less direct, support for the same point may be found in 6 AAC 50.050, which sets out two exclusive mechanisms for shortcutting the full consistency review process—categorical approval (subsection (b)) and general concurrence (subsection (c)).[22] Neither of these shortcuts

---

al Zone Management Act of 1972), and each conclusive state consistency determination when a project requires a permit, lease, or authorization from two or more state resource agencies.

18. AS 46.40.096(b) (emphasis added).

19. 6 AAC 80.010(b) (emphasis added).

20. AS 46.40.210(3).

21. 6 AAC 50.990(22). Under 6 AAC 50.990(7), " 'consistency review' has the meaning given in AS 46.40.210."

22. 6 AAC 50.050 provides:

(a) The consistency review of a project will be expedited as provided in (b) or (c) of this section if the project meets the requirements of one of those subsections.

(b) A project which requires one or more state or federal permits, each of which appears on the list published under (e) of this section listing permits which have been categorically approved by DGC as being consistent with the ACMP, is considered to have been conclusively determined by DGC to be consistent with the ACMP. A permit will be categorically approved if DGC determines that the activity authorized

by the permit will have no significant impact in the coastal zone.

(c) A project which requires one or more state or federal permits not categorically approved as provided in (b) of this section will be considered consistent without further review, if it meets the requirements of a general concurrence determination contained on the list published under (e) of this section. A "general concurrence determination" is a consistency determination for a type of project which includes only routine activities, and which can be effectively made consistent with the ACMP by imposing standard stipulations on the applicable permit. If a subsequent project of any applicant fits the description in a general concurrence determination, the project will be considered consistent with the ACMP if it complies with the stated standard stipulations.

(d) A project which requires one or more state or federal permits, and which is not within the categories described in (b) or (c) of this section, is subject to review as an individual project as provided in this chapter.

(e) DGC will publish a list of permits which have been categorically approved as being consistent with the ACMP, and a list of general concurrence determinations, and will identify on each list those permits or projects for which a coastal project questionnaire is not neces-

includes omitting from the scope of a particular project's consistency review process a project activity that happens to be preauthorized under the terms of a general, area-wide permit.

Other provisions similarly underscore the importance of including within the scope of a project's consistency review all proposed project uses and activities for which permits are required, not just those for which permits have yet to be issued. For example, a state agency conducting a consistency review must solicit comments from any "coastal resource district in which a project is proposed to be located or which may experience a direct and significant impact from a proposed project[.]" [23] And AS 46.40.210(7)(C) includes within the definition of "use of direct and significant impact" any use or associated activity that "proximately contributes to a material change or alteration in the natural or social characteristics of a part of the state's coastal area and in which ... the use would, of itself, constitute a tolerable change or alteration of the resources within the coastal area but which, cumulatively, would have an adverse effect."

Moreover, in the analogous context of phased consistency review, it is noteworthy that the issuance of a permit or authorization based on a consistency review conducted at an early phase of a project does not exempt the permitted use or activity from further review. Even though AS 46.40.094 specifically allows the state discretion to segment projects into progressive phases and provides that each phase may undergo its own consistency review and permitting process, the statutory phasing mechanism expressly restricts this approach to situations in which each successive phase must undergo further discretionary review and the reviewing agency conditions its current consistency determination by requiring that a new consistency determination be made at each successive phase.[24] The phasing statute thus assures

---

sary. DGC will amend these lists as necessary on its own initiative, or on the request of a coastal resource district or a resource agency based on new information regarding the impacts of these activities, including cumulative impacts. Before publishing or amending these lists, DGC will distribute the proposed lists or amendments for comment in the manner provided in 6 AAC 50.070 for a project consistency review.

**23.** AS 46.40.096(d)(1), (g).

**24.** AS 46.40.094(a), (b)(1); *see also Kachemak Bay Conservation Soc. v. State, Dep't of Natural Res.*, 6 P.3d 270, 289 (Alaska 2000). AS 46.40.094(a) and (b) provide:

(a) The provisions of this section apply to a use or activity for which a consistency determination is required if

(1) at the time the proposed use or activity is initiated, there is insufficient information to evaluate and render a consistency determination for the entirety of the proposed use or activity;

(2) the proposed use or activity is capable of proceeding in discrete phases based upon developing information obtained in the course of a phase; and

(3) each subsequent phase of the proposed use or activity is subject to discretion to implement alternative decisions based upon the developing information.

(b) When a use or activity is authorized or developed in discrete phases and each phase will require decisions relating to a permit, lease, or authorization for that particular phase, the agency responsible for the consistency determination for the particular phase

(1) may, in its discretion, limit the consistency review to that particular phase if, but only if,

(A) the agency or another state agency must carry out a subsequent consistency review and make a consistency determination before a later phase may proceed; and

(B) the agency responsible conditions its consistency determination for that phase on a requirement that a use or activity authorized in a subsequent phase be consistent with the Alaska coastal management program; and

(2) shall, when the consistency review is limited under (1) of this subsection, conduct the consistency review for the particular phase and make the consistency determination based on

(A) applicable statutes and regulations;

(B) the facts pertaining to a use or activity for which the consistency determination is sought that are

(i) known to the state agency responsible or made a part of the record during the consistency review; and

(ii) material to the consistency determination; and

(C) the reasonably foreseeable, significant effects of the use or activity for which the consistency determination is sought;

(3) shall, when the consistency review is limited under (1) of this subsection, describe in the consistency determination the reasons for its decision to make the consistency determination for the use or activity in phases.

repeated consistency review and gives no indication that the earlier consistency determination should truncate the presumably more comprehensive scope of each successive determination. To the contrary, as we expressly observed when we interpreted AS 46.40.094 in *Kachemak Bay Conservation Society v. State, Department of Natural Resources*, the statute's authorization of a phased consistency review process does not allow the state to avoid "thorough review of a project or its potential effects by artificially dividing the project," because it does not relieve the state "of its duty to take a *continuing* 'hard look' at future development.... To the contrary, [the state] is obliged, at *each phase* of development, to issue a ... conclusive consistency determination relating to *that* phase before the proposed development may proceed." [25]

Just as with phased review under AS 46.40.094, then, the division of the Osprey project's actual permitting process into two distinct permitting segments—one federal process and one state process—should provide no occasion for an artificially segmented consistency review process in which neither consistency review comprehensively considers or finally determines the consistency of all permitted uses and activities included in the whole project at issue. For as we have observed on other occasions, "the more segmented an assessment of environmental hazards, the greater the risk that prior permits will compel [the state] to approve later, environmentally unsound permits." [26]

Despite the state's and Forest Oil's protests to the contrary, we find little danger of superfluity or inefficiency in requiring the Osprey's discharge activities to undergo two separate reviews for consistency with the Coastal Program. The two separate consistency reviews at issue here encompassed two separate projects. The first broadly focused on the consistency of the EPA general permit that authorizes various levels of discharges by exploratory platforms throughout the upper Cook Inlet region, while the second

*should have* more specifically focused on the consistency of the activities encompassed by all necessary Osprey project permits—those already issued and those still to be issued. Nor do the terms of the general permit purport to exempt the Osprey project from a further, project-specific consistency review process. To the contrary, Part VI(K) of the EPA general permit expressly states that "[n]othing in this permit must be construed to ... relieve the Permittee from any responsibilities ... established pursuant to any applicable state law or regulation[.]"

To be sure, the general permit's review process covered much ground that ordinarily would have been covered by the Osprey project's individualized review process had the Osprey's review process included Forest Oil's discharge activities. And by the same token, the favorable consistency determination given to the general permit certainly might have provided a strong foundation for evaluating the consistency of Forest Oil's proposed discharges in the context of the Osprey's project-specific review process. To this extent, then, the evidence presented in the earlier review and the state's evaluation of that evidence in its first consistency determination could have illuminated the latter process: the need for a second, project-specific review certainly would not have required the state to ignore the first or to redetermine issues that it had already fully considered. But on the other hand, the mere existence of an earlier consistency determination for the EPA's general permit could not by itself justify completely excluding the subject of wastewater discharge activities from the Osprey project's project-specific consistency review. Nor could it excuse the state from complying with its usual duty to take a hard look at the whole Osprey project and make an appropriately explained determination of the entire project's consistency with all relevant Coastal Program standards.

Because the Osprey's discharge activities unquestionably comprised part of the Osprey

**25.** *Kachemak Bay Conservation Soc.*, 6 P.3d at 290, 294 (initial internal emphasis added).

**26.** *Trustees for Alaska v. State, Dep't of Natural Res.*, 851 P.2d 1340, 1344 (Alaska 1993) (citing

*Trustees for Alaska v. Gorsuch*, 835 P.2d 1239, 1246 n. 6 (Alaska 1992)); *see also Kachemak Bay Conservation Soc.*, 6 P.3d at 293–94.

project, we hold that a complete consistency review for the project could not be conducted without considering those activities.

## C. Waiver and Res Judicata/Collateral Estoppel

■ Forest Oil nonetheless protests that Cook Inlet Keeper either is barred by the doctrines of res judicata or collateral estoppel from arguing for project-specific review or waived its right to raise this argument by failing to raise it below.[27] Neither argument has merit.

■ Res judicata precludes subsequent litigation of a claim that could have been brought during a prior administrative or judicial adjudication that resulted in a final judgment.[28] Here, as already noted above, the state conducted a consistency review in connection with the EPA's general permitting process for Cook Inlet discharges; that review addressed a distinct "project" and had a markedly different scope than the specific project addressed in the state's separate consistency review of the Osprey project. As a practical and legal matter, Cook Inlet Keeper could not have litigated the proposed Osprey project's specific consistency with the Coastal Program in the procedural context of the general permit's consistency review. Moreover, Forest Oil identifies nothing from the record of the state's review process of the general permit that served timely notice on Cook Inlet Keeper or other interested parties that its consistency determination in that proceeding would not be subject to case-specific re-evaluation as part of the usual review process that would later be required for any newly proposed exploration project involving discharges covered by the general permit.

■ Nor does Forest Oil point to any specific issue of fact or law that was actually and necessarily decided in the former review proceeding so as to collaterally estop Cook Inlet Keeper from raising any issues it sought to assert in the Osprey project's review proceedings. There are three necessary elements to a claim of collateral estoppel:

> (1) the issue decided in a prior adjudication was precisely the same as that presented in the action in question; (2) the prior litigation must have resulted in a final judgment on the merits; and (3) there must be "mutuality" of parties, i.e., collateral estoppel may be invoked only by those who were parties or privies to the action in which the judgment was rendered.[29]

Here, even assuming that Forest Oil satisfied its burden of establishing the second and third elements, it has failed to establish the first.[30]

■ Forest Oil fares no better with its waiver argument. In *Trustees for Alaska v. State, Dep't of Natural Resources,* we stated that a party must meaningfully raise an issue in administrative proceedings so as to preserve it for appeal by alerting the agency to the party's position and contentions.[31] Here, in soliciting public comment on the Osprey project, the state noted that, if the general permit was finally approved before the conclusion of the Osprey project's consistency review process, Forest Oil would rely on the EPA general discharge permit rather than on the project-specific permit it had requested.

By the time public comments were due, the EPA general permit had been finally approved. Responding to the state's request for comment, Cook Inlet Keeper's comment acknowledged that the general permit cov-

---

27. The state does not appear to join Forest Oil's arguments on these points.

28. *See Calhoun v. State, Dep't of Transp. & Pub. Facilities,* 857 P.2d 1191, 1195–96 (Alaska 1993).

29. *Briggs v. State, Dep't of Pub. Safety, Div. of Motor Vehicles,* 732 P.2d 1078, 1081–82 (Alaska 1987).

30. *See generally Johnson v. Alaska State Dep't of Fish & Game,* 836 P.2d 896, 908 (Alaska 1991)

(stating that administrative findings should only be used preclusively if doing so would be fair and that fairness minimally requires that the prior proceedings included "the essential elements of adjudication").

31. 865 P.2d 745, 748 (Alaska 1993) (citing *Vermont Yankee Nuclear Power Corp. v. NRDC,* 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978)).

ered the Osprey platform's discharge activities but argued that the state had authority to apply more stringent state-law standards. The comment expressly noted the facial inconsistency between the Osprey project's discharge activities and the Coastal Program's general habitat standard.[32] It went on to emphasize that the project's location would require compliance with the habitat standards governing estuarine and offshore areas.[33] The comment further reminded the state that Forest Oil bore the burden of proving compliance with the applicable standards: "Regardless of the standard applied, the applicant carries the burden of showing compliance with the ACMP, and at a minimum, the applicant must make a conclusive showing of·'no harm' in order to prove the project will 'maintain' habitat and fisheries." [34]

In our view, these comments easily sufficed to alert both the state and Forest Oil to Cook Inlet Keeper's contentions and position. True, they only implicitly asserted Cook Inlet Keeper's present contention· that Alaska law required a separate, project-specific consistency determination. But when it submitted its initial comment, Cook Inlet Keeper had no obvious need to advance a more elaborate argument on this point: before the Osprey project's public comment period closed, the state gave no express notice of its intent to completely omit the Osprey's discharge activities from the scope of the project's consistency review determination. Given the apparently unprecedented nature of this omission, Cook Inlet Keeper can hardly be faulted for failing to predict the state's position.

Finding no ground to sustain Forest Oil's claims of res judicata, collateral estoppel, or

waiver, we must vacate the final consistency determination and remand for a new consistency determination that considers the Osprey's discharge activities within the scope of the project's overall consistency review.[35]

## IV. CONCLUSION

For the foregoing reasons, we VACATE the Division of Governmental Coordination's Final Consistency Determination of September 14, 1999, and REMAND for a new consistency determination in keeping with this opinion.

---

**32.** *See* 6 AAC 80.130(b).

**33.** *See* 6 AAC 80.130(c)(1), (2).

**34.** The comment additionally noted a factor that has not arisen in subsequent proceedings and seems to have no lasting significance in the context of this appeal: the need to ensure that the project's activities not interfere with beluga whale migration and feeding, a concern that prompted Cook Inlet Keeper to ask the state to require the National Marine Fisheries Service to approve Forest Oil's plan of operations.

**35.** Our decision makes it unnecessary to give detailed attention to Cook Inlet Keeper's argument that the final consistency determination should have applied the tripartite test of 6 AAC 80.130(d) by considering the existence of significant public need, a feasible prudent alternative, or additional steps that could be taken to maximize conformance of the Osprey to the habitat standard. Because the new consistency determination on remand will be based on all project activities, including discharges, the determination must include appropriate findings under 6 AAC 80.130.