**TRUSTEES FOR ALASKA, Northern Alaska Environmental Center, the Sierra Club, the National Parks and Conservation Association, and the Wilderness Society, Appellants,**

v.

**STATE of Alaska, DEPARTMENT OF NATURAL RESOURCES; State of Alaska, Office of Management and Budget, Appellees.**

No. S–2865.

Supreme Court of Alaska.

March 16, 1990.

Rehearing Denied April 10, 1990.

**806**

Randall M. Weiner and Eric Smith, Trustees for Alaska, Anchorage, for appellants.

M. Francis Neville, Steven R. Porter, Asst. Attys. Gen., Anchorage, Douglas B. Baily, Atty. Gen., Juneau for appellees.

Carl J.D. Bauman, Hughes, Thorsness, Gantz, Powell & Brundin for amici curiae.

Before MATTHEWS, C.J., and RABINOWITZ, BURKE, COMPTON and MOORE, JJ.

## OPINION

MATTHEWS, Chief Justice.

This is an administrative appeal by five environmental groups (hereinafter collectively "Trustees") which seek to overturn a competitive sale of oil and gas leases ("Sale 50"). The appellees are the State of Alaska, its Office of Management and Budget, and its Department of Natural Resources. At issue is the procedural propriety and substantive basis of the decision to lease.

### I.

The state held Sale 50 on June 30, 1987. The oil and gas development rights to 118,-147 acres of offshore state land in Camden Bay, 35 tracts in all, were offered and sold. Camden Bay is located on the northern coast, west of Kaktovik and north of the Arctic National Wildlife Refuge ("ANWR").

Trustees challenged the decision of the Department of Natural Resources ("DNR")[1] to proceed with Sale 50. This decision was reflected in DNR's Final Best–Interests Finding. On June 1, 1987, Trustees filed a motion with DNR to reconsider its Sale 50 decision. DNR did reconsider, but declined to change its decision. Trustees filed suit. Their motion for a preliminary injunction was denied, and Sale 50 proceeded as scheduled on June 30, 1987.

In July 1987, Trustees agreed to dismiss their prior action for declaratory relief, and instead brought this administrative appeal. The trial court upheld Sale 50 in every respect. Trustees now appeal. They raise a number of procedural and substantive

---

**1.** AS 38.05.035(e) empowers the director of DNR, with the consent of the commissioner of DNR, to approve contracts for sale, lease, or other disposition of state land upon a written finding that such disposition is in the state's best interests. To simplify the discussion, this memorandum refers to the director, the commissioner, and the entire Department of Natural Resources collectively as "DNR."

challenges to DNR's decision to hold Sale 50.

## II.

*Did Trustees Have a Fair Opportunity to Comment?*

■ Trustees claim that until DNR issued its Final Best–Interests Finding, the fundamental assumption underlying the sale was that development would occur only if it became possible to place support facilities onshore, in ANWR. Trustees discuss several documents which seem to show a DNR decision to delay Sale 50 until after Congress decided whether to open ANWR, on the theory that development of Camden Bay could only proceed given adequate onshore support facilities. Trustees maintain that when DNR "abrupt[ly]" changed its position in August 1986 and decided to hold the sale, its only reason for so doing was political—to influence Congress' ANWR decision.

The problem thereby created, according to Trustees, is that as DNR's preliminary findings gave no indication that production could occur in Camden Bay without onshore support facilities in ANWR, DNR's Final Finding represents an abrupt switch from a shore-based project to one reliant upon offshore transportation. Trustees argue that they did not have a fair opportunity to comment on such an approach and that, had they known of this change, they would have submitted "a number of important arguments and significant evidence" regarding the environmental hazards of

offshore transportation to DNR during the comment period. Because of this alleged failure on DNR's part, Trustees seek a remand so that the public may have a full opportunity for comment.

DNR points out that its Preliminary Best–Interests Finding does provide notice that an offshore transport infrastructure was contemplated. In the "Summary and Conclusion" section of that document, DNR states:

> The possibility of oil and gas development and the associated impact on the coastal plain of ANWR will be dealt with by Congress when it decides whether or not to open ANWR to oil and gas leasing. Such a discussion is beyond the scope of this document. At this time it is assumed that any exploration or development in Camden Bay would be supported by *offshore facilities* or facilities located at approved onshore sites.

(Emphasis added.) Thus, DNR argues that Trustees had ample notice of the possibility of offshore transport facilities, and cannot now complain of a lack of opportunity to comment thereon. In addition, DNR responds that whether or not Trustees had adequate notice from the start that offshore development was contemplated, they had ample opportunity to present information to DNR in their reconsideration briefing.[2]

Alaska Statute 38.05.035(e) gives DNR the power to sell, lease, or otherwise dispose of state lands upon a written finding that "the interests of the state will be best served" by the disposition.[3] *See Ham-*

---

**2.** DNR also notes several items in the record which demonstrate that it has consistently viewed development in ANWR as preferable, but not necessarily *essential* to development of Camden Bay. Similarly, DNR's Preliminary Finding states that the possibility of leasing in ANWR would "greatly increase the economic potential of proposed Sale 50," but does not hinge development on this contingency.

**3.** AS 38.05.035(e) states in part:

Upon a written finding that the interests of the state will best be served, the director may, with the consent of the commissioner, approve contracts for the sale, lease, or other disposal of available land, resources, property or interests in them, and, in addition to the .

conditions and limitations imposed by law, may impose additional conditions or limitations in the contracts as the director determines, with the consent of the commissioner, will best serve the interests of the state. A contract for the sale, lease, or other disposal of available land or an interest in land is not legally binding on the state until the commissioner approves the contract but if the appraised value is not greater than $50,000 in the case of the sale of land or an interest in land, or $5,000 in the case of the annual rental of land or interest in land, the director may execute the contract without the approval of the commissioner. Before a public hearing, if held, or in any case no less than 21 days before the sale, lease, or other disposal of available land, property, resources, or in-

*mond v. North Slope Borough,* 645 P.2d 750, 758 (Alaska 1982). The written finding must set out the law and facts on which DNR has based its conclusion, and must be made available to the public at least twenty-one days before the disposition. AS 38.-05.035(e). Similarly, AS 38.05.945 provides that when the director makes a decision to dispose of property under AS 38.05.035(e), the public must be given adequate notice and an opportunity to comment at least thirty days before the sale.[4]

In *Alaska Survival v. State,* 723 P.2d 1281, 1287 (Alaska 1986), we observed that there is no explicit statutory requirement for amended findings or additional public comment upon discovery of new information pertaining to a land disposition. We noted, however, that an agency's failure to closely consider an important factor would render its decision arbitrary.

We have addressed the sufficiency of notice and comment in the analogous context of promulgation of agency regulations.[5] In *Chevron U.S.A. v. LeResche,* 663 P.2d 923 (Alaska 1983), the issue before the court was whether the initial notice of proposed regulations contained adequate notice of the contents of the final rule. *Id.* at 929. Applying AS 44.62.-200(b),[6] we held that a final regulation may vary from its form in the initial notice if the subject matter remains the same and the public has been reasonably notified that the proposed action might affect its interests. *Id.*

Federal courts take a similar approach. One court has stated the general rule:

> Even substantial changes in the original plan may be made so long as they are "in character with the original scheme" and "a logical outgrowth" of the notice and comment already given.
>
> The essential inquiry is whether the commenters have had a fair opportunity to present their views on the contents of the final plan. We must be satisfied, in other words, that given a new opportunity to comment, commenters would not have their first occasion to offer new and different criticisms which the Agency might find convincing.

*BASF Wyandotte Corp. v. Costle,* 598 F.2d 637, 642 (1st Cir.1979) (footnotes and citations omitted) *cert. denied* 444 U.S. 1096, 100 S.Ct. 1063, 62 L.Ed.2d 784 (1980). *See also Connecticut Light and Power Co. v. Nuclear Regulatory Comm'n,* 673 F.2d

---

terests in them, the director shall make available to the public a written finding that sets out the facts and applicable law upon which the determination that the sale, lease, or other disposal will best serve the interests of the state was based.

**4.** AS 38.05.945 states in part:

(a) This section establishes the requirements for notice given by the department for the following actions:
....
(3) a decision under AS 38.05.035(e) regarding the sale, lease, or disposal of an interest in state land or resources;
....
(b) Notice of one or more actions described in (a) of this section shall be given at least 30 days before the action by publication in newspapers of statewide circulation and in newspapers of general circulation in the vicinity of the proposed action and one or more of the following methods:
(1) publication through public service announcements on the electronic media serving the area affected by the action;
(2) posting in a conspicuous location in the vicinity of the action;

(3) notification of parties known or likely to be affected by the action; or
(4) another method calculated to reach affected persons. A notice shall contain sufficient information in commonly understood terms to inform the public of the nature of the action and the opportunity of the public to comment on the action.

**5.** Regulations properly filed by an administrative agency are presumed to be procedurally valid. AS 44.62.100(a)(3). A regulation must substantially fail to comply with the Administrative Procedure Act's procedural requirements to be declared invalid. AS 44.62.300. *See also State v. First Nat'l Bank of Anchorage,* 660 P.2d 406, 425 (Alaska 1982).

**6.** AS 44.62.200(b) provides:

A regulation which is adopted, amended or repealed may vary in content from the summary specified in (a)(3) of this section if the subject matter of the regulation remains the same and the original notice was written so as to assure that members of the public are reasonably notified of the proposed subject of agency action in order for them to determine whether their interests could be affected by agency action on that subject.

525, 533 (D.C.Cir.1982) *cert. denied* 459 U.S. 835, 103 S.Ct. 79, 74 L.Ed.2d 76 (1982); *Weyerhaeuser Co. v. Costle*, 590 F.2d 1011, 1031 (D.C.Cir.1978).

While Trustees claim that they had no notice that offshore facilities were contemplated before DNR published its Final Finding, the Preliminary Finding stated that Sale 50 could occur notwithstanding Congress' inaction regarding ANWR. Further, the Preliminary Finding stated that activities in Camden Bay might be supported by offshore facilities. The offshore development approach reflected in the Final Finding is at least a logical outgrowth of that notice. We thus conclude that Trustees were given a fair opportunity to comment.

## III.

*Was DNR's Decision Arbitrary, Capricious or Unreasonable?*

■ Trustees challenge the merits of DNR's finding that Sale 50 is in the state's best interest. Alaska Statute 38.05.035(e) gives DNR the power to sell, lease, or otherwise dispose of state lands upon a written finding that the interests of the state will be best served by such disposition. In *Hammond v. North Slope Borough*, 645 P.2d 750 (Alaska 1982), we determined the standard of review applicable to DNR's best-interest determination. Such determinations involve complex subject matter or fundamental policy formulations. Therefore, we review the decision "only to the extent necessary to ascertain whether the decision has a 'reasonable basis,'" and to ensure that it "'was not arbitrary, capricious, or prompted by corruption.'" *Id.* at 758, 759.

■ While DNR's ultimate decision is subject to deferential review, we nevertheless must ensure that DNR has "taken a 'hard look' at the salient problems" and has "genuinely engaged in reasoned decision making." *Alaska Survival v. State*, 723 P.2d 1281, 1287 (Alaska 1986).

Where an agency fails to consider an important factor in making its decision, the decision will be regarded as arbi-

trary. *State v. 0.644 Acres, More or Less*, 613 P.2d 829, 833 (Alaska 1980). As one distinguished judge has put it, the role of the court is to

ensure that the agency "has given reasoned discretion to all the material facts and issues." The court exercises this aspect of its supervisory role with particular vigilance if it "becomes aware, especially from a combination of danger signals, that the agency has not really taken a '*hard look*' at the salient problems and has not genuinely engaged in reasoned decision making."

Leventhal, Environmental Decision Making and the Role of the Courts, 122 U.Pa. L.Rev. 509, 511 (1974) (emphasis in original, footnotes omitted).

*Southeast Alaska Conservation Council v. State*, 665 P.2d 544, 548–49 (Alaska 1983). The facts and premises on which the decision is based should appear in DNR's decisional document. *Ship Creek Hydraulic Syndicate v. State*, 685 P.2d 715, 717 (Alaska 1984).

Trustees support their contention that the decision to conduct the lease sale was arbitrary, capricious and unreasonable with three arguments:

(1) The Final Finding does not sufficiently explain the basis for DNR's decision that the benefits of leasing Camden Bay outweigh the risks;

(2) The Final Finding does not discuss the economic feasibility or environmental problems associated with production and transportation of oil, assuming that the status of ANWR does not change and that ANWR is thus unavailable as a support site for offshore production; and

(3) The discussion in the Final Finding of the possible cumulative impacts of the sale combined with other oil and gas developments on the North Slope of the Brooks Range and in the Beaufort Sea is insufficient.

The Final Finding is a 62–page document exclusive of appendices. It discusses the general effects of oil exploration, production and transportation on fish and wildlife. It contains sections concerning species in the sale area which require special consid-

eration, such as bowhead whales, ringed seals and polar bears. The Finding identifies critical bird habitats and an unusual kelp community in the sale area. It sets out stipulations which are designed to eliminate or mitigate adverse effects with respect to these species and habitats. The Finding also details the existing human use of the sale area and expresses the means by which existing uses can be protected.

The Finding describes qualitatively the likely harm that would result from development of Camden Bay as an oil producing area. The conclusion of this assessment is, in general, that the adverse effects will not be very great because the various specified stipulations will minimize them.

The Finding also contains a section discussing the anticipated cumulative effects of oil production at Camden Bay taken together with oil production in adjacent areas. It concludes that the cumulative effects, like the individual effects from the Camden Bay sale itself, are not likely to be of great significance since all of the developments are subject to informed government scrutiny.

With respect to the benefits of leasing Camden Bay, the Finding notes that the sale area has "moderate to high petroleum potential." The document expresses our state government's dependence on petroleum-related income—86 percent of state revenues for fiscal year 1986. It observes that this sale is a part of the state's oil and gas leasing program, the long-range goal of which is "to provide the basis for a stable, prosperous economy." The Finding states that even if there is no discovery or no production in the sale area, the state will still significantly benefit from the bonus payments received for the privilege of leasing.[7] The Finding also notes that another benefit of the sale will be to make existing oil discoveries near the sale area economically feasible to develop in the event of production from the sale area.

██ Turning to the Trustees' first argument, (insufficient explanation of risks and benefits of leasing Camden Bay) we conclude that the Finding discussion is, in general, sufficient.[8] Critical habitat and species are discussed, and the means to minimize harm to them are set forth and are incorporated in the leases. A qualitative assessment of the various risks is set forth. While Trustees doubtless find the assessment to be unduly optimistic, the detail and subject matter of the discussion are such that we are persuaded that DNR has given reasoned discretion to the material facts and issues.

██ The same conclusion for the same reasons is applicable to Trustees' third argument relating to cumulative effects.

██ We agree, in part, however, with Trustees' second argument relating to the transportation of oil if ANWR cannot be used. The Finding determines that the leasing of Camden Bay is in the best interest of the state, even if Congress does not change the status of ANWR and open it for use as a site for shore-based support and transportation facilities. Without the use of ANWR, DNR acknowledges that production and transportation of oil from the sale area would become much more expensive and difficult. The Finding does not, however, discuss how the oil would be transported if ANWR cannot be used.

Trustees mention two transportation alternatives, a subsea pipeline and a pipeline built on a gravel causeway, the base of which would be on the floor of the sea. Both of these pipelines would have to extend to the west beyond the western boundary of ANWR before they could turn to the shore and discharge into more conventional land-based facilities. Because of the size of the sale area, the undersea or sea causeway pipelines could be 50 miles long. These facilities are unquestionably a vital part of the development of the sale area for oil production and thus are important factors in the decision to lease the sale

---

7. These, as it turned out, amounted to some $6.6 million.

8. The only exception to this is with respect to the special risks associated with offshore transportation. These are discussed below in connection with Trustees' second argument.

area. They would seem to present unique environmental risks. Yet the Finding is remarkable in that—as detailed as it is on other subjects—it fails to mention facilities of this magnitude at all, much less examine the critical question of whether they are safe.

As previously noted, our role in this case is to ensure that DNR "has given reasoned discretion to all the material facts and issues." If an agency does not consider an important factor, its decision is regarded as arbitrary, and those important factors which it did consider, must be discussed in the decisional document. *Southeast Alaska Conservation Council v. State*, 665 P.2d 544, 548–49 (Alaska 1983); *Ship Creek Hydraulic Syndicate v. State, supra.* Because the Finding omits any discussion of transportation facilities should ANWR's present status be unchanged, it clearly does not meet this standard of review.

Accordingly, we find that a remand to DNR will be necessary. On remand, the agency should consider the unique risks presented by the oil transportation methods that would be necessary if the legal status of ANWR remains unchanged. Those risks should be weighed with the other risks and benefits flowing from the decision to lease. The best-interest determination required by AS 38.05.035(e) should thus be reconsidered and a supplemental written finding should be made.[9]

■ The other aspect of Trustee's second argument relates to economic feasibility. Trustees contend that DNR's decision to proceed with the sale without onshore support facilities in ANWR is unreasonable because without such support facilities, production and transportation of oil would be economically infeasible. We do not accept this argument. No law requires DNR to demonstrate the economic feasibility of developing Camden Bay. As-

suming, if nothing else, that the state benefits from the bonus and lease income from Sale 50, this court need not inquire into the feasibility of future development.

## IV.

*Has the State Complied with the ACMP Consistency Requirement?*

■ The Alaska Coastal Management Program ("ACMP"), AS 46.40.010–210, protects numerous environmental and cultural values in Alaska's coastal zone. AS 46.40.-020. *See Hammond v. North Slope Borough*, 645 P.2d 750, 761 (Alaska 1982). When a project requires two or more state or federal permits, leases, or authorizations, the Office of Management and Budget (OMB) must render a finding as to whether the project is consistent with the ACMP. AS 44.19.145(a)(11);[10] 6 AAC 50.-010(1)(B). In this case, however, DNR performed the consistency review. Trustees contend that this was error, and request a remand so that OMB may make the required finding.

The state makes two arguments. First, that Sale 50 is not a project that requires multiple permits, leases, or authorizations. Rather, it argues that the sale only requires DNR's best-interests finding, and thus is not subject to the OMB consistency review process.

The state's argument conflicts with the plain meaning of the regulations and statute at issue. OMB's regulation requires that it render the conclusive ACMP consistency determination when a "project" requires two or more state or federal permits. 6 AAC 50.010(1)(B). The term "project" applies to an activity which requires the issuance of one or more state permits. 6 AAC 50.190(14). The term "permit" includes leases. 6 AAC 50.190(13). Sale 50 contemplated issuing

9. We of course express no view as to what that finding should be.

10. AS 44.19.145(a)(11) provides:

(a) The office shall

. . . .

(11) render, on behalf of the state, all federal consistency determinations and certifications authorized by 16 U.S.C. 1456 (§ 307, Coastal Zone Management Act of 1972), and a conclusive state consistency determination when a project requires two or more state or federal permits, leases, or authorizations.

35 leases and thus falls within 6 AAC 50.-010(1)(B).

Second, the state argues that, pursuant to OMB's regulations, OMB could delegate the consistency determination to DNR. 6 AAC 50.030(b) provides that a resource agency (such as DNR) shall coordinate the consistency review and make the consistency determination when the project requires the permits of only a single state agency. Trustees challenge this regulation as invalid on the grounds that it conflicts with AS 44.19.145(a)(11).

 To be valid a regulation must be consistent with the authorizing statute and reasonably necessary to carry out the statute's purpose. AS 44.62.030.[11] An administrative agency's interpretation of its own regulation is normally given effect unless plainly erroneous or inconsistent with the regulation. *Tunley v. Municipality of Anchorage School Dist.*, 631 P.2d 67, 78, n. 30 (Alaska 1981); *State, Dep't of Highways v. Green*, 586 P.2d 595, 602 n. 21 (Alaska 1978). As Sale 50 is a project which requires two or more state leases, the plain language of AS 44.19.145(a)(11) clearly requires that OMB perform a consistency review of the sale.[12] The statute leaves no room for an exception for projects involving only one agency. We conclude, therefore, that OMB must render a consistency determination in this case.[13]

### V.

Trustees had a fair opportunity to comment on DNR's finding that Sale 50 was in the state's best interests. However, DNR's Final Finding is deficient in that it did not review the environmental problems associated with oil transportation from the sale area, assuming no change in the status of ANWR. With regard to all other issues, we affirm the Best–Interests Finding.

DNR and OMB failed to comply with the procedural requirements of the ACMP. OMB cannot delegate its statutory duty to DNR. It must make the ACMP consistency determination. For these reasons, we remand this case to the superior court with instructions to remand to DNR and to OMB for further action in accordance with this opinion.

AFFIRMED in part, REVERSED in part, and REMANDED for further proceedings.

---

**11.** A two-step analysis is used in assessing the validity of an administrative regulation. First, the court looks to whether the regulation is consistent with and reasonably necessary to carry out the purposes of the authorizing statute. Second, it must be determined whether the regulation is reasonable and not arbitrary. *Chevron U.S.A. v. LeResche,* 663 P.2d 923, 926 (Alaska 1983); *Kelly v. Zamarello,* 486 P.2d 906,

911 (Alaska 1971). Here, we are concerned with only the first step.

**12.** See footnote 10, *supra.*

**13.** Because we remand for OMB's consistency determination, we need not address Trustees other ACMP challenges.