KUITSARAK CORPORATION; Arviq Corporation; Cenaliulriit; Traditional Village Counsel of Mumtraq; City of Goodnews Bay; Nunam Kitlutsisti; Association of Village Council Presidents, Appellants,

v.

Rod SWOPE, Commissioner; Gerald Gallagher, Director, Division of Mining; and Alaska Dept. of Natural Resources; Coastal Policy Council; Karin Sheardown, Appellees.

No. S–5176.

Supreme Court of Alaska.

March 4, 1994.

Eric Smith, Anchorage, for appellants.

Elizabeth J. Kerttula, Juneau, and Kyle W. Parker, Anchorage, Asst. Attys. Gen., Charles E. Cole, Juneau, Atty. Gen., for appellees.

Before MOORE, C.J., and RABINOWITZ, MATTHEWS and COMPTON, JJ.

## ORDER

On consideration of the petition for rehearing filed by the State of Alaska on January 24, 1994, and the opposition to it filed February 7, 1994,

IT IS ORDERED:

1. The petition for rehearing is GRANTED as to the second issue raised by the State and DENIED as to the first issue.

2. Opinion No. 4042, published on January 14, 1994, is WITHDRAWN.

3. Opinion No. 4063 is issued on this date in its place.

Entered by direction of the court at Anchorage, Alaska, on March 4, 1994.

## OPINION

PER CURIAM.

## I. INTRODUCTION

This dispute arises from the Department of Natural Resources Division of Mining's (DNR) approval of certain Offshore Prospecting Permits (OPPs) requested by Karin Sheardown for Goodnews Bay and portions of Kuskokwim Bay. The Cenaliulriit Coastal Management District (Cenaliulriit) and various local villages challenge the superior court decisions upholding DNR's Best Interest Finding and the Coastal Policy Council's (CPC) determination that DNR's findings were consistent with Cenaliulriit's Coastal

Management Plan (CMP).[1] We reverse the superior court and remand to DNR to conduct further proceedings consistent with this opinion.

## II. FACTS AND PROCEEDINGS

In 1982, Karin Sheardown filed twenty-two OPP applications for Goodnews Bay and the surrounding Kuskokwim Bay.[2] These applications remained on file with DNR until November 1987, when Sheardown formally requested that DNR consider her OPP applications.[3] DNR expressed interest in exploring the mineral potential of Goodnews and Kuskokwim Bays, but indicated that its financial resources were limited. In order for DNR to issue an OPP, it must determine that it is in the State's best interest to issue the permit. AS 38.05.035(e).

However, because DNR did not have adequate funding in 1988, Sheardown and DNR agreed that Sheardown would finance a resource assessment report (RAR) which DNR required prior to making its best interest determination.[4] Sheardown agreed to use contractors approved by DNR to perform the research and data collection for the RAR. Sheardown agreed to provide a draft RAR

for public review and comment and to "consider and incorporate [DNR's] comments as appropriate." The RAR agreement also outlined the resource information that DNR required to make its best interest determination.[5] DNR sent copies of the RAR agreement with Sheardown to the Alaska Department of Fish and Game (ADF & G), the Alaska Department of Environmental Conservation (DEC) and the Alaska Division of Governmental Coordination (DGC).

Four contractors from the DNR's approved list prepared the draft RAR and WGM Mining Inc. (WGM) summarized it.[6] Local communities were involved in preparing the RAR draft *via* public and local agency meetings. In November 1988, DNR released a draft RAR for public comment. Cenaliulriit and ADF & G criticized the draft RAR.[7] Sheardown submitted the final RAR to DNR on January 3, 1989. The final RAR incorporated some, but not all, of ADF & G's comments. DNR sent copies of the final RAR to ADF & G, DEC, DGC, Cenaliulriit, the Association of Village Council Presidents, Vernon Bavilla of Kuitsarak Corporation, Peter Samuels of Arviq, Inc., and Nunam Kitlutsisti.[8] DNR also stated its intention to

---

1. The appellants in this case are Kuitsarak Corporation, Arviq Corporation, Traditional Village Council of Mumtraq, City of Goodnews Bay, Nunam Kitlutsisti, the Association of Village Council Presidents and Cenaliulriit (hereinafter collectively referred to as "Kuitsarak"). The appellees are Rod Swope, Commissioner; Gerald Gallagher, Director, Division of Mining; DNR; CPC and Sheardown (hereinafter collectively referred to as "State").

2. According to DNR, OPPs are property interests that prioritize claims to certain lands. OPPs do not authorize the holder to mine or explore for minerals.

3. In 1975, DNR suspended the OPP program to avoid conflicts with the federal oil and gas leasing programs in the Gulf of Alaska. However, DNR continued to accept OPP applications to establish preferential rights until 1983, when the agency ceased accepting applications due to a backlog of unadjudicated applications.

4. The RAR was to provide information necessary for DNR to begin making its best interest determination. The purpose of the RAR was to "form the data base from which potential impacts will be assessed and decisions made."

5. The agreement specified that the RAR should include information regarding: a physical description of the region, geology and mineral potential, habitat, fisheries, wildlife, local communities, land use plans, possible exploration and mining operations, potential environmental and social impacts on the region, and possible mitigation measures.

6. WGM apparently asserted an interest in the disputed OPPs. WGM also aided Sheardown in "planning and executing exploration of the subject lands."

7. The ADF & G suggested more than 100 substantive changes to the draft RAR.

8. DNR also sent copies of the final RAR to each resident of Goodnews Bay and Platinum who previously attended public meetings regarding the OPPs. When the DNR disseminated the final RAR to the public, Cenaliulriit questioned the objectivity of the RAR given WGM's involvement with the RAR and its financial interest in the outcome of DNR's decision. Cenaliulriit requested that the matter be brought to the attention of the CPC.

DNR denied that a conflict of interest existed in the preparation of the RAR, but nonetheless

hold "informal" public meetings in Bethel, Goodnews Bay and Platinum to discuss the RAR prior to drafting the preliminary best interest finding.[9] In March 1989, DNR issued its Preliminary Best Interest Finding and Proposed Consistency Determination (PBIF). DNR stated that, although some areas inside Goodnews Bay were to be closed for mining, it intended to issue OPPs for other areas inside Kuskokwim Bay and along the coast. As required under AS 38.05.-945(a)(3), DNR gave public notice of the PBIF and issued a request for comments through publication in various newspapers throughout the state.[10]

The notice set forth the area being considered for issuance of OPPs and stated that public hearings would be held in Bethel, Goodnews Bay and Platinum to accept verbal comments about the proposed action. In order to ensure that the local residents understood both the proposed action and that they could participate in the administrative process, DNR prepared a video tape for public viewing explaining the proposed action in English and Yupik.

Cenaliulriit, villages, and native organizations in the area were opposed to offshore mineral exploration until further information was available. Specifically, Cenaliulriit found that issuance of the proposed OPPs was inconsistent with the approved Coastal Management Plan (CMP). The native organizations stressed that the PBIF did not adequately analyze the impact of mining in the region.

State agencies were also critical of the PBIF. Among other things, DEC felt that it could not adequately assess the impact of mining on the region and was concerned about maintaining the water quality inside Goodnews Bay. ADF & G was concerned about the preservation of wildlife habitat both inside and around Goodnews Bay and believed that the PBIF inaccurately portrayed the subsistence uses outside of Goodnews Bay. ADF & G recommended that DNR reject all OPP applications within Goodnews Bay and within one-half mile of the sandbars at the mouth of the bay. ADF & G also recommended that a one-half mile buffer zone be created along the coastline of Kuskokwim Bay where exploration would be prohibited. Additionally, ADF & G recommended that permit stipulations for the protection of fish and wildlife habitat be strengthened or added.[11]

In July 1990, DNR issued its "Proposed Final Best Interest Finding and Coastal Consistency Determination Regarding Issuance of Offshore Prospecting Permits Near Goodnews Bay, Alaska" (proposed final findings). The proposed final findings rejected all OPP applications inside Goodnews Bay and within one-half mile of the sandbar and shoal entrance to the bay. DNR also established a 500–foot buffer from the mean-high tide on tracts along the coastline in Kuskokwim Bay and added the stipulations for the protection of wildlife that ADF & G requested.[12] OPPs were to be issued for the re-

rewrote the summary section and had the U.S. Bureau of Mines rewrite the section on mineral potential. The propriety of WGM's participation in the preparation of the RAR and the comments regarding the draft best interest finding is discussed *infra* at section C.

9. The "informal" public meetings regarding the RAR were held on February 6, 1989 in Bethel and on February 7, 1989 in Goodnews Bay and Platinum.

10. Notice and copies of the PBIF were sent to the postmasters in Goodnews Bay and Platinum, the Calista Regional Native Corporation, Kuitsarak Corp., Arviq, Inc. and other affected village corporations. Additionally, the forty-eight people who had previously attended the public meetings, fifteen state and federal agencies and the state representatives from the region, were also mailed the notice and PBIF.

11. Sheardown also criticized the preliminary best interest finding and proposed consistency determination. She believed that all the OPPs should be approved. According to Sheardown, the potential adverse effects of mining should only be considered if prospecting discovered the presence of platinum in the region.

12. These stipulations addressed the timing of exploration, pump intake screening, monitoring, use of explosives, habitat rehabilitation and aerial disturbance of wildlife. In response to DEC's concerns, DNR also added a stipulation requiring sampling and monitoring of water quality and adoption of a DEC approved oil spill contingency plan as conditions for approval of a plan of operations.

maining tracts not closed to exploration.[13] Despite Cenaliulriit's claims to the contrary, DNR found that it had given Cenaliulriit's comments "due deference" and that the proposed final findings were consistent with both Cenaliulriit's CMP and the Alaska Coastal Management Plan (ACMP).

Pursuant to the ACMP, DNR was required to seek the concurrence of Cenaliulriit, ADF & G, DEC and Sheardown for the proposed final findings. 6 AAC 50.070(j). Sheardown, Cenaliulriit and ADF & G did not concur with the proposed final findings and each restated their concerns to the resource directors pursuant to 6 AAC 50.070(j). Several issues regarding various stipulations were resolved at the director level. However, the primary dispute, the need for and size of the buffer zone, was not resolved and was elevated to the commissioners.[14] *See* AAC 50.070(j).

The commissioners of DNR, ADF & G, and DEC decided to compromise and established a one-quarter mile buffer zone. The decision whether to issue OPPs for tracts between the buffer and the one-half mile mark from the coastline was postponed pending further study of marine habitats in that area.[15] DNR issued its "Final Best Interest Finding and Coastal Consistency Determination Regarding Issuance of Offshore Prospecting Permits Near Goodnews Bay, Alaska" (BIF) on August 10, 1990. The BIF discusses considerations taken into account by DNR in determining the state's best interest and contains eighteen stipulations to protect the region from exploration activities resulting from DNR's grant of the OPPs to Sheardown.[16] The BIF also discusses the ACMP and Cenaliulriit CMP and how the standards specified therein are satisfied by the rejection of some of Sheardown's OPP applications and the imposition of the eighteen stipulations.

On August 17, 1990 Cenaliulriit sent the CPC notice of its intent to appeal DNR's BIF. Cenaliulriit sent its "Petition for Appeal Before the Alaska Coastal Policy Council on Goodnews Bay Offshore Prospecting Permit Disposal Area" (petition) on August 28, 1990. Kuitsarak filed a Notice of Appeal of the DNR decision in superior court on September 12, 1990. DNR issued Sheardown the OPPs specified in the BIF prior to the CPC meeting on Cenaliulriit's petition.

A CPC subcommittee convened to review Cenaliulriit's petition on October 8, 1990. The subcommittee was advised to review the petition under a standard of review similar to the "substantial evidence" test to determine whether Cenaliulriit had made a proper "showing" under AS 46.40.100(b).[17] After considering the evidence, the CPC subcommittee found that Cenaliulriit did not make a sufficient "showing" and denied the petition.

---

13. DNR reasoned that it did not fully analyze the impact of mining for the explorable tracts because it was difficult to predict what mining activities would eventually be proposed, and thus the impact could best be analyzed when the lessee submitted a mining plan of operation in order to have the OPPs converted into mining leases.

14. Sheardown requested that OPPs be granted in Goodnews Bay and that a buffer zone was not required to make the proposed findings consistent with the ACMP. ADF & G maintained that the 500–foot buffer proposed by DNR was inconsistent with the habitat standards enumerated in 6 AAC 80.130, (providing that coastal area habitats must be managed to maintain or enhance the biological, physical and chemical characteristics which contribute to its capacity to support living resources) and that a one-half mile buffer zone along the coastline in Kuskokwim Bay was necessary to protect the marine habitat. Cenaliulriit also supported the one-half mile buffer proposed by ADF & G.

15. Plans for studying marine habitat in the deferral zone were not included in the DNR's final best interest findings. DNR maintains that details of the marine study need not be included in the final best interest findings because OPPs were not issued inside the deferral zone.

16. Sheardown was granted OPPs for areas outside of Goodnews Bay and the buffer zone. The BIF allowed limited exploration inside the deferred zone, provided that certain studies are conducted at the same time as the exploration.

17. AS 46.40.100(b) provides: "On petition of a coastal resource district, a citizen of the district, or a state agency, showing that a district coastal management program is not being implemented, enforced or complied with, the council shall convene a public hearing to consider the matter...."

Cenaliulriit appealed this finding to the superior court. The appeals of the DNR and CPC decisions were consolidated and the parties agreed to stay the OPPs until the superior court addressed the agency determinations.

In its February 19, 1991 opinion and its June 10, 1991 opinion on rehearing, the superior court affirmed DNR's BIF but overturned the CPC decision, concluding that the CPC used an incorrect standard in determining whether Cenaliulriit had made a sufficient "showing" under AS 46.40.100(b). The superior court ruled that AS 46.40.100(b) requires only a prima facie showing that a district's coastal management plan is not being implemented or complied with, before a full adjudicatory hearing will be held. The court directed the CPC to conduct a full adjudicatory hearing if Cenaliulriit made a prima facie showing. On July 23, 1991 the CPC determined that Cenaliulriit made a prima facie showing, and pursuant to Cenaliulriit's request, scheduled a full adjudicatory hearing on the petition.

The hearing on the Cenaliulriit petition was held September 23–24, 1991. Cenaliulriit requested three changes to the BIF to make it consistent with Cenaliulriit's CMP. First, Cenaliulriit wanted the one-half mile area from shore in Kuskokwim Bay and certain areas near the entrance to Goodnews Bay closed to mining. Second, it wanted DNR to defer issuance of OPPs in other areas until further information was available to determine whether mining should proceed. Lastly, Cenaliulriit requested that both Goodnews Bay and Platinum be integrated into the DNR's decision-making process.[18]

During the hearing, the focus of Cenaliulriit's case was that mining would violate its CMP. Cenaliulriit argued that the OPP stage was the critical stage in determining whether or not to allow mining. DNR argued that an OPP holder had to complete several other procedures before the OPPs are converted to mining leases. DNR's position was that an OPP cannot be converted into a mining lease without a second BIF. The CPC denied Cenaliulriit's petition and affirmed the DNR's coastal consistency determination. The CPC concluded that DNR had adequate information to determine that issuance of the OPPs was consistent with the ACMP and Cenaliulriit's CMP and that DNR gave Cenaliulriit's suggested changes to the BIF "due deference."[19]

Following the CPC decision, Cenaliulriit appealed to the superior court, which affirmed the CPC and DNR decisions on February 10, 1992. The superior court's February 1991 and February 1992 orders were consolidated for this appeal.

## III. DISCUSSION

No deference is given to the superior court's decision when it acts as an intermediate court of appeal. *Leslie Cutting, Inc. v. Bateman*, 833 P.2d 691, 693 (Alaska 1992). In reviewing agency decisions involving complex subject matters or fundamental policy determinations, "[o]ur role is to ensure that the agency has 'taken a *"hard look"* at the salient problems' and has 'genuinely engaged in reasoned decision making.'" *Alaska Survival v. State Dep't of Natural Resources*, 723 P.2d 1281, 1287 (Alaska 1986) (quoting *Southeast Alaska Conservation Council, Inc., v. State*, 665 P.2d 544, 549 (Alaska 1983)). We review the agency decision "only to the extent necessary to ascertain whether the decision has a 'reasonable basis,' and to ensure that it 'was not arbitrary, capricious, or prompted by corruption.'" *Trustees for Alaska v. State Dep't of Natural Resources*, 795 P.2d 805, 809 (Alaska 1990) (quoting *Hammond v. North Slope Borough*, 645 P.2d 750, 758–59 (Alaska 1982)). "[W]here an agency fails to consider an important factor in making its decision, the decision will be regarded as arbitrary." *Trustees*, 795 P.2d at 809. We review DNR's decision to issue OPPs for portions of Kuskokwim Bay under the "reasonable basis" standard.

---

**18.** This last request was made because DNR previously stated that Platinum was not a "traditional village" and that Goodnews Bay was too distant to require notification of certain events per the BIF.

**19.** The CPC noted that DNR adequately considered Cenaliulriit's concerns and that DNR had not authorized mining activities.

## A. DNR's Decision to Open Parts of Kuskokwim Bay to OPPs Requested After January 2, 1983 Violates State Law.

Kuitsarak initially argues that DNR erred in finding that issuing any OPPs was in the state's best interest because DNR's decision violates 11 AAC 86.500, which states in relevant part:

(b) An applicant may file for and be granted an offshore prospecting permit only on tide and submerged land that has been opened for offshore prospecting permits.

(c) Notwithstanding (a) and (b) of this section and 11 AAC 86.565, all prospecting permit applications pending as of January 2, 1983, will be adjudicated without regard to whether the area applied for was open to filing at the time of application. This action is intended to preserve priority rights established by the application's order of filing. The commissioner is exercising his authority under AS 38.05.020 and AS 38.05.035(b)(2) to grant and preserve these priority rights in order to avoid inequitable detriment to diligent applicants due to situations over which the applicants had no control. The commissioner finds that this exercise of this authority under AS 38.05.035(b)(2) is in the best interests of the state.

(d) No person may file offshore prospecting permit applications that exceed, in the aggregate or in combination with offshore prospecting permits already held by that person, 300,000 acres.

(e) Notwithstanding (d) of this section, any person who, as of January 2, 1983, has pending prospecting permit applications that exceed 100,000 acres, shall, within 24 months after January 1, 1983, reduce the acreage under prospecting permit application to 300,000 acres or less. The department will adjudicate and issue up to 100,000 acres of offshore prospecting permits according to a priority list established by the applicant to the extent administratively practicable. If excess applications are not relinquished, adjudication of pending applications will take place in an order determined by the department.

(f) All tide and submerged land will be opened for offshore prospecting permit applications on June 30, 1984, unless the department finds that

(1) the land contains known mineral deposits that will be offered by competitive leasing;

(2) mining would be incompatible with significant surface uses; or

(3) adequate funding has not been appropriated for disposal of these minerals under the procedures provided by law.

DNR interprets 11 AAC 86.500 as follows: first, subsection (b) restricts the filing of new OPP applications to those tide and submerged lands that are opened for filing OPPs. Second, subsection (c) provides an exception to subsection (b) in that all OPP applications filed on or before January 2, 1983, will be processed without regard to whether a specific area was open for filing at the time the OPP applications were made. Third, subsections (d) and (e) establish acreage limitations on new and pending applications. Last, subsection (f) mandates that all tide and submerged land be reopened for the filing of new applications on June 30, 1984, unless DNR makes one of three findings expressed in subsection (f). Of particular importance to this dispute is subsection (f)(3), which requires that all tide and submerged lands be reopened for filing of new OPP applications unless adequate funding is not appropriated.[20]

Kuitsarak argues that subsection (f)(3) applies to all OPP applications and that DNR explicitly determined that funds had not been appropriated for a determination whether prospecting should be allowed in Kuskokwim and Goodnews Bays. The State argues that because Sheardown's OPP applications were made prior to January 2, 1983, they are

20. On June 27, 1984, three days before the deadline for reopening all state lands for OPP applications, the state issued a finding that because of funding limitations, only one area would be open for filing new OPP applications between July 1984 and December 1985. The June 27, 1984 finding also stated that "[o]ther state tide and submerged land will remain closed to the filing of new offshore prospecting permit applications."

exempt from subsection (f)(3)'s funding provision.

■ We must uphold DNR's interpretation of its own regulations where, as here, the proffered interpretation is not plainly erroneous. *Trustees for Alaska,* 795 P.2d at 812. The decision to grant Sheardown's OPP applications that were filed prior to January 2, 1983 did not violate DNR's regulations. However, to the extent DNR's decision opened some areas of Kuskokwim Bay for OPPs that were filed after the 1983 deadline, DNR's decision must be reversed. Tracts 1–5 were not included in Sheardown's original application filed prior to January 1983. These areas were opened in 1990, when state lands were closed to new OPPs. DNR recognized, "At this time, adequate funding has not been provided for this program and the state's tide and submerged lands are closed to the filing of new OPP applications." Tracts 1–5 were closed for purposes of issuing OPPs. DNR's decision to open these areas of Kuskokwim Bay for OPPs was contrary to its own interpretation of its regulations and, therefore, erroneous.

B. *DNR Impermissibly Declined to Adequately Analyze the Impacts of Off-shore Mining.*

■ Kuitsarak argues that although DNR has the discretion to make a best interest finding at the OPP stage, once the OPP applications are granted, the State cannot deny the conversion of the permits to mining leases because they are not in the best interest of the state. Kuitsarak maintains that DNR was required to assume that mining was inevitable, because once a workable deposit is discovered, the State can only place conditions on mining, not prohibit it altogether.

The State responds that DNR did not need to determine the potential impacts of mining at the OPP stage because the OPPs do not grant Sheardown the right to mine. Under the State's interpretation of the regulatory scheme, DNR retains the discretion to deny an OPP's conversion to a mining lease if the conveyance would not be in the state's best interest. Therefore, the State contends that DNR was not required to consider the effects of mining in determining whether to grant Sheardown's OPPs.[21] We conclude that Kuitsarak's arguments are more persuasive.

Once an OPP is granted, the holder, with appropriate permits, is entitled to explore the specified area to determine whether it contains "workable mineral deposits." AS 38.-05.250(a), (b); 11 AAC 86.530. A "workable mineral deposit" is "a locatable mineral deposit that has been shown by the applicant to have a reasonable prospect of developing into a successful mine, based on the presence of one or more locatable minerals of sufficient value and quality to induce a prudent operator to pursue development under present conditions." 11 AAC 86.530(e).

Once minerals are discovered on an OPP site, the director of DNR is vested with broad discretion in determining whether any minerals found constitute a "workable deposit." *State Dep't of Natural Resources v. Universal Education Society, Inc.,* 583 P.2d 806, 812 (Alaska 1978). However, once a workable mineral deposit is found to exist, the statute's plain language requires DNR to grant the OPP holder a noncompetitive mining lease. AS 38.05.250(b).[22] The State's contention that DNR is authorized to make a second best interest finding prior to authorization of a mining lease is not supported by the statute or our prior decisions.[23]

---

**21.** DNR declined to conduct an in-depth analysis of the effects of mining in the region because it lacked the information to make an adequate determination.

**22.** "A noncompetitive lease shall be granted to a holder of a prospecting permit for so much of the land subject to the permit as is shown to the satisfaction of the director to contain workable mineral deposits." AS 38.05.250(b). 11 AAC 86.530(a) states, "At any time while an offshore prospecting permit is in effect, the permittee is

entitled to a noncompetitive mining lease on that part of the permit area that has been shown to the satisfaction of the director to contain workable mineral deposits."

**23.** Interestingly, in Table 1 of the BIF, DNR states that a prospecting permit is converted to a lease "[u]pon satisfying [the] Director that workable deposits exist." A second best interest determination is not mentioned.

■ The State relies upon two cases to support its contention that DNR has the discretion to determine that mining is not in the state's best interest after DNR has granted the OPPs. In *Universal Education Society*, 583 P.2d at 809, the director of DNR denied the OPP holder's request to convert his OPPs to mining leases because DNR was not satisfied that the mineral deposit in question was a "workable deposit." The OPP holder appealed the agency decision to the superior court which concluded that the DNR regulations employed in determining whether to grant an offshore mining lease did not comport with due process requirements. *Id.* at 809. We held that because the OPP holder was not entitled to a lease until the director determined that the minerals constituted a "workable deposit," the OPP holder lacked the requisite property interest to support his due process claim.[24] *Id.* at 809–10. *Universal Education Society* does not support the State's contention that it is entitled to conduct a second best interest finding should a "workable mineral deposit" be discovered.

Similarly, the State's reliance on *North Slope Borough v. Leresche*, 581 P.2d 1112 (Alaska 1978), is not persuasive. In *Leresche*, we held that the North Slope Borough's selection of state lands pursuant to the Alaska Land Act was qualified and that

DNR could reject the Borough's choice of property as not being in the best interest of the state.[25] *Id.* at 1116. Unlike AS 38.05.-250(b), the Alaska Land Act expressly provided that a borough's or city's land selection must be in the best interest of the state. Based on the language and the legislative history of the statute we concluded that the state retained discretion to reject a particular selection of land.[26] The State's contention that the "shall issue a patent" language in AS 29.18.190(b) is analogous to the "a noncompetitive lease shall be granted" language in AS 38.05.250(b) is without merit.

Finally, the State argues that DNR considered the impacts of mining to the extent possible at the OPP stage. The record establishes that, although the RAR and the BIF contain several references to the impacts of mining on biological and subsistence resources, the analysis is less than complete. The RAR's general discussion of mining techniques and impacts is not a "hard look" at the potential impacts of mining in the region. DNR closed Goodnews Bay for exploration because of the bay's sensitivity to disturbance and concerns about the dangers of mining in that area. It is not clear whether DNR properly analyzed the heavy metal concentrations, fish migration patterns, background water quality and other mining im-

24. The State cites the following passage from *Universal Education Society*, 583 P.2d at 811–12, to support its claims:

It is clear to us that the decision to grant or deny offshore mining leases is within the expertise of the Division of Lands. The decision involves both fundamental policy formulations and complex subject matter. The Division has been entrusted by the legislature with the allocation of lands for offshore mining leases. In making this allocation the Division must make, among others, determinations as to what is the best use of land, where precisely the land is located, and what method of mining will most efficiently recover the valuable minerals. By necessity the answers to these questions are based on complex data which no court is as capable of analyzing and deciding as is the Division.

These statements are not contrary to our holding in this case. DNR is the agency that determines what lands will or will not be opened for mining and its decisions are entitled to great deference. However, DNR cannot open an area for exploration and then later determine that mining is not in the best interest of the state. The proper time

to conduct a best interest finding regarding mining is at the OPP stage.

25. AS 29.18.190 provided in relevant part:

State Land. A borough or city may select 10 per cent of the vacant, unappropriated, unreserved state land located within its boundaries. In the selection of land under the Alaska Statehood Act, it is the policy of the state to make available to cities and boroughs the maximum land area from which to make selections under this section consistent with the best interest of the state....

(b) If land desired by the borough or city is unsurveyed at the time of its selection, the Department of Natural Resources shall survey or approve a survey by the borough or city of the exterior boundaries of the area requested without interior subdivision and shall issue a patent for the selected area in terms of the exterior boundary survey....

26. North Slope Borough attempted to select land within the Prudhoe Bay oil field, at the time the largest oil field in North America. *Leresche*, 581 P.2d at 1116.

pacts outside of Goodnews Bay.[27] Additionally, there is no indication that DNR considered the cumulative impacts of mining in the region.[28] In short, we are not convinced that DNR adequately considered the various impacts related to mining in the Kuskokwim Bay region.

The State's argument that it could have done little more to fully assess the impacts of mining in the region than it did at the OPP stage is significantly undercut by evidence of comparable federal studies. The record indicates that the federal government has conducted environmental impact studies for offshore mining based on various mining scenarios. DNR can emulate these studies. Although any assessment will necessarily be somewhat general, DNR should be familiar enough with the different methods of mining to estimate impacts on the environment. Once the initial impact of mining on the region has been assessed, any unforeseen occurrences or conditions that are revealed during exploration can be dealt with by DNR through use of stipulations and conditions

imposed on mining.[29] By analyzing the effects of mining in Kuskokwim Bay at the OPP stage, DNR can alleviate some of the dangers associated with lease determinations made on a case-by-case basis.[30]

Once DNR is satisfied that a "workable deposit" exists on an OPP site, it must issue the OPP holder a noncompetitive lease. While DNR must approve a plan of operations before mining may begin,[31] and may condition the terms of a mining lease or cancel the lease under certain circumstances, it may not decide that mining is not in the state's best interest after determining that exploration is in the best interest of the state. AS 38.05.250(b). It is incumbent on DNR to assess the impact of mining on the region prior to issuing OPPs.[32] Where, as here, DNR failed to consider an important factor, its decision is deemed arbitrary. *Trustees v. Dep't of Natural Resources*, 795 P.2d at 811. We remand to DNR to assess the potential impacts of mining in and around Kuskokwim Bay prior to determining whether to grant Sheardown's OPP applications.[33]

27. Despite DNR's refusal to grant Sheardown OPPs inside Goodnews Bay due to turbidity concerns, DNR did not adequately consider turbidity outside Goodnews Bay. The BIF does not address turbidity concerns outside of Goodnews Bay and the RAR simply mentions that turbidity outside of Goodnews Bay should be minimal and can be controlled through the use of silt curtains and containment ponds. The BIF also does not contain any analysis of oil spill impacts. DNR simply states that a fuel spill contingency plan will be required.

28. In her Appellee's brief, Sheardown admits that DNR did not assess the impacts of mining in Kuskokwim Bay. The RAR recommended that offshore mining impacts in Kuskokwim Bay be assessed *after* exploration identifies specific mineral deposits:
 Detailed impacts and constraints to marine reclamation cannot be determined until site specific mining plans have been prepared. Obviously, such plans would not be prepared until exploration reveals whether or not commercially viable minerals exist.
 DNR correctly recognized it would need to assess offshore mining impacts [in Kuskokwim Bay] after exploration revealed more about the quality, location and characteristics of any such deposits.

29. In contrast, the current stipulations in the BIF are directed solely at exploration activities.

30. The primary danger associated with lease determinations made on a case-by-case basis is that the cumulative environmental threat posed by mining is not adequately considered. *See Trustees for Alaska v. State, DNR*, 851 P.2d 1340 (Alaska 1993).

31. *See* 11 AAC 86.800.

32. We believe that in enacting AS 38.05.250(b), the legislature recognized the unfairness of allowing a permittee to prospect for minerals and then deny him or her the opportunity to mine the same. We also acknowledge the potential for waste of both economic and judicial resources in requiring multiple best interest determinations.

33. Kuitsarak also asserts that the OPPs issued to Sheardown violate the Bristol Bay Area Plan (BBAP). Specifically, the BBAP states that dredging is permitted only after a determination is made that it will cause no significant adverse impact on the fish habitat and that no other prudent alternative site exists. The OPPs do not authorize any dredging or mining activity. DNR failed to adequately analyze the effects of mining, which it must do. For the reasons stated above, on remand, DNR must consider whether the OPPs comply with the BBAP.

C. *DNR's Delegation of the Preparation of the RAR to Sheardown and Her Contractors (one of which had a financial interest in the project) was Impermissible under the Circumstances.*

 Kuitsarak argues that DNR's decision must be reversed because the RAR is biased, and therefore, fundamentally flawed. Kuitsarak asserts that Sheardown's agreement with DNR to be financially responsible for preparation of the RAR, and the participation of an "interested" contractor in the review of the RAR, created an impermissible conflict of interest. The RAR's purpose was to "form the data base from which potential impacts will be assessed and decisions made." In this respect, the RAR was analogous to a federal Environmental Impact Statement (EIS). *See* 42 U.S.C. § 4332(2)(c). In this case the RAR was one of the major components of the BIF; it was the sole basis for the PBIF, and was relied upon in the BIF.[34]

While Sheardown paid for the RAR, she did not write it. DNR required Sheardown to select contractors for the RAR from a DNR approved list. Dames & Moore prepared the biological resource assessment; Jon Isaacs and Associates prepared the community resources and land management assessment; and Westervelt Engineering, Ltd. prepared the mineral potential assessment. WGM prepared a summary based on assessments conducted by the other three firms, contributed to the RAR section on mineral potential and assembled the report. Subsequent to the preparation of the RAR, Sheardown hired WGM to assist in the planning and exploration phases of her proposed project. Apparently, WGM also "staked" an interest in some of the lands under consideration by DNR.

34. The BIF also relied upon additional information provided by other resource agencies, the Bureau of Mines and public comment.

35. *Contra, Greene County Planning Bd. v. Federal Power Comm'n,* 455 F.2d 412, 420 (2nd Cir. 1972), *cert. denied. Federal Power Comm'n v. Greene County Planning Bd.,* 409 U.S. 849, 93 S.Ct. 56, 34 L.Ed.2d 90 (1972). ("The Commission appears to be content to collate the comments of other federal agencies, its own staff and the intervenors and once again act as an umpire.

Kuitsarak argues that two separate conflicts of interest taint the RAR, WGM's participation in the RAR process and DNR's delegation of the RAR to Sheardown and her contractors. Although this court has not considered the issue previously, the weight of federal authority holds that federal agencies may delegate their obligations to prepare environmental impact statements to "interested" contractors provided that the agency bears responsibility for the work product to satisfy the statute. *See Brandon v. Pierce,* 725 F.2d 555, 564 (10th Cir.1984); *Essex County Preservation Ass'n v. Campbell,* 536 F.2d 956, 960 (1st Cir.1976); *Sierra Club v. Lynn,* 502 F.2d 43, 59 (5th Cir.1974).[35]

> We must stress that when project consultants are also used in the preparation of the EIS considerable caution should be exercised by the federal agency. The agency clearly may not substitute a private firm's efforts and analysis for its own, and it must bear responsibility for the ultimate work product designed to satisfy 42 U.S.C. § 4332(2)(C).

*Essex County Preservation Ass'n v. Campbell,* 536 F.2d at 960. In this case, Sheardown and her contractors were responsible for conducting the RAR. Specifically, WGM was charged with reviewing the RAR. DNR's agreement with Sheardown simply stated that she "consider and incorporate the division's comments as appropriate." Although DNR did identify the type of information needed to make its decision, the State does not argue that DNR, in fact, bore responsibility for the RAR. Instead the State argues that Sheardown's ability to disregard DNR's comments is irrelevant, since DNR retained discretion to grant or deny Sheardown's OPP applications.[36] The State's argument is without merit.

> The danger of this procedure, and one obvious shortcoming, is the potential, if not likelihood, that the applicant's statement will be based on self-serving assumptions.") (footnotes omitted).

36. The State also argues that the BIF did not rely solely on the RAR and thus need not be disturbed even if the RAR was tainted. This argument is not persuasive given that the RAR was the cornerstone of the State's best interest determination.

■■■■■■■■■■■■■■■■■■

WGM's participation in the RAR process does not in itself create an impermissible conflict of interest.[37] However, coupled with DNR's delegation of its obligation to prepare the RAR to Sheardown and her contractors, we believe DNR failed to take the requisite responsibility for the preparation of this important document. Despite the State's claims to the contrary, the fact that DNR retained its discretion to deny Sheardown's applications is not dispositive in determining whether a conflict existed. The RAR was the primary document relied upon in making the BIF. If information in the RAR or a similar data compilation was biased, the fact that DNR retains its decision-making power is of little consequence. DNR's decision will necessarily be made, in part, based on a flawed document.[38] The previously cited authorities require that DNR take responsibility for the work product upon which the BIF is based.

Where an interested contractor participates in the drafting of a RAR or a similar data compilation, DNR must maintain the requisite amount of control to allow it to take meaningful responsibility for the underlying data. DNR's failure to do so requires us to find that the RAR was inadequate. Therefore, we order DNR to conduct or adequately supervise a second RAR or a similar data compilation for the proposed OPP applications.[39]

## IV. CONCLUSION

DNR properly considered Sheardown's OPP applications filed prior to January 2, 1983. However, DNR's decision violated state law when it opened areas for prospecting after January 2, 1983. DNR improperly failed to consider the effects of mining prior to granting Sheardown's OPPs and failed to adequately supervise the RAR conducted by Sheardown's contractors. Therefore, DNR's Best Interest Finding was arbitrary and cannot stand.

We REVERSE the superior court's decision regarding the OPPs granted for applications filed after January 2, 1983, as they were granted contrary to DNR's regulations. We also REVERSE the superior court's decision upholding DNR's Best Interest Finding and the CPC's affirmance of the BIF and REMAND to DNR to conduct a BIF consistent with this opinion.

---

**37.** Portions of the RAR that were drafted by WGM were rewritten by the U.S. Bureau of Mines.

**38.** The fact that ADF & G suggested over 100 substantive changes to the document and that it disagreed with the RAR's characterization of subsistence uses in the area indicates that the original RAR was at best flawed. Although DNR made some changes as a result of other agencies' input, we do not believe that suggestions by the other resource agencies supplants DNR's responsibility for data contained in the RAR.

**39.** Because we remand to DNR to provide a new RAR or a similar data compilation and to consider the effects of mining on the region, we need not consider whether (1) DNR properly conclud-

ed that issuance of the OPPs was consistent with Cenaliulriit's CPM; (2) DNR granted Cenaliulriit's comments due deference; and (3) whether CPC's determination that DNR's decision was consistent with Cenaliulriit's CMP was supported by substantial evidence. In light of our decision, DNR must make a new determination as to whether issuance of the OPPs is consistent with Cenaliulriit's CMP. Additionally, Cenaliulriit should be provided a new opportunity to comment on DNR's findings. However, we note that Kuitsarak's claims that DNR erred in not classifying Platinum as a traditional village and that DNR erroneously did not include Goodnews Bay in the notice requirement of stipulation 16 are without merit.